# EXHIBIT 2

Execution Version

## CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** (as it may be amended, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of the 15th day of September, 2008, by and between New Enterprise Associates 10, Limited Partnership, a Delaware limited partnership ("Lender"), and Hospital Partners of America, Inc., a Delaware corporation ("Borrower").

## RECITALS

A.     Certain wholly owned subsidiaries of the Borrower (excluding River Oaks Medical Center Management, Inc. and River Oaks Holdings, Inc., the "Management Subsidiaries") own a majority of the equity interests in each of certain entities that own, operate and manage hospitals (excluding River Oaks Medical Center, L.P., the "Hospital Subsidiaries," together with the Borrower and the Management Subsidiaries, the "HPA Parties"). The Borrower has determined that it is in its best interests to obtain additional liquidity to, among other things, help preserve the ongoing operations of the Hospital Subsidiaries, and maximize their value by providing the HPA Parties additional time to realize the value of those businesses.

B.     Borrower has advised Lender that it may initiate a case under Chapter 11 of the Bankruptcy Code (the "Case");

C.     Borrower has requested that Lender provide (i) the revolving credit facility described below in order to fund certain costs and expenses which must be incurred by Borrower prior to the filing of the Case in order to facilitate the continuous operation of the Borrower's business as contemplated above and (ii) if the Borrower determines to file the Case, debtor-in-possession financing to the Borrower concurrently with the filing of the Case;

D.     Subject to the terms and conditions of this Agreement, Lender has agreed to provide the revolving credit facility described below in order to enable Borrower to file the Case in an orderly manner and in anticipation of providing debtor-in-possession financing to Borrower, if the Borrower determines to file the Case;

E.     Borrower acknowledges that it has advised Lender that if the Borrower determines to file the Case, as part of its pleadings in the Case it will request that any loans made to Borrower hereunder will be incorporated into the debtor-in-possession financing to be provided to the Borrower by the Lender; and

F.     Capitalized terms not defined in the text of this Agreement are defined in Section 1.1.

## AGREEMENT

**NOW, THEREFORE,** Lender and Borrower hereby agree as follows:

# ARTICLE I.

# DEFINITIONS

## SECTION 1.1    DEFINITIONS

The following terms used in this Agreement shall have the following meanings:

"**A&M**" shall mean Alvarez & Marsal North America, LLC.

"**Account**" shall mean that disbursement account of Lender maintained at First Republic Bank, account no. 80000184458.

"**Approved Goods or Services**" means goods sold or services rendered by the Hospital Subsidiaries in the ordinary course of business, in compliance with all material applicable Laws, and consistent with the type of goods sold or services rendered by the Hospital Subsidiaries throughout all or substantially all of their business operations as of the Closing Date. Approved Goods or Services may include Medical Services, but only to the extent the same were provided by the Hospital Subsidiaries prior to the Closing Date.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Business Day**" means any day (other than a day which is a Saturday, Sunday or legal holiday in the State of Maryland) on which banks are open for business in Baltimore, Maryland, Los Angeles, California and Austin, Texas.

"**Cash Distributions**" has the meaning set forth in Section 2.3.

"**Closing Date**" means September 15, 2008.

"**CMS**" means the Centers for Medicare & Medicaid Services.

"**Collateral**" means "Pledged Collateral" as such term is defined in the Security Agreement.

"**Facilities**" means each acute care hospital facility and acute care hospital facility maintained by any Hospital Subsidiary, each located on the Real Property and any other location or facility at which such Hospital Subsidiary provides Medical Services.

"**GAAP**" shall mean generally accepted accounting principles.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**HPA Cash Flow Forecast**" shall mean the Cash Flow Forecast set forth on Annex A.

2

"**Insurer**" means a Person that insures a Patient against certain of the costs incurred in the receipt by such Patient of Medical Services, or that has an agreement with any Hospital Subsidiary to compensate such Hospital Subsidiary for providing goods or services to a Patient.

"**Knowledge**" means, with respect to any Responsible Officer, no information has come to the attention of such Responsible Officer, which information has given such Responsible Officer, knowledge of facts contrary to the existence of or absence of such facts indicated; provided, however, that any representation or warranty herein as to the Knowledge of a Responsible Officer shall be without recourse or personal liability to such Responsible Officer.

"**Law**" means, with respect to any Person, any statute, law, rule, regulation, ordinance, order, permit, license, writ, judgment, injunction, decree, determination, award or other restriction or requirement of any Governmental Authority applicable to such Person or its property.

"**Lien**" means any lien (statutory or other), security interest, mortgage, deed of trust, priority, pledge, charge, conditional sale, title retention agreement, financing lease or other encumbrance or similar right of others, or any agreement to give any of the foregoing.

"**Material Adverse Effect**" shall mean a material adverse change in, or a material adverse effect upon, the condition (financial or otherwise), assets, operations, properties, performance or prospects of Borrower or any other event that is reasonably likely to impair in any material respect either (i) the prospect of payment or performance by Borrower of its obligations under any of the Loan Documents or (ii) the rights or remedies of Lender under any Loan Document; provided that a Material Adverse Effect shall not include the filing of the Case or the normal attendant developments deriving from, or effects of, a bankruptcy filing.

"**Medicaid**" means the medical assistance programs administered by state agencies and approved by CMS pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 *et seq.*

"**Medical Services**" means medical and health care services provided to a Patient, including, but not limited to, medical and health care services provided to a Patient and performed by any Hospital Subsidiary that are covered by a policy of insurance issued by an Insurer, and includes physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home health care services, residential and out-patient behavioral healthcare services, and medicine or health care equipment provided by any Hospital Subsidiary to a Patient for a necessary or specifically requested valid and proper medical or health purpose. Nothing herein shall be deemed or construed to constitute an acknowledgement that any HPA Party renders Medical Services.

"**Medicare**" means the program of health benefits for the aged and disabled administered by CMS pursuant to the terms of Title XVIII of the Social Security Act, codified at 42 U.S.C. 1395 *et seq.*

"**Medistar Judgment**" means any judgment that may be entered against the Borrower or any HPA Party in connection with the lawsuit filed by Medistar Corporation et. al. against the Borrower.

"**Net Cash Proceeds**" shall mean with respect to any sale or disposition by Borrower, directly or indirectly, of property or assets, the amount of cash proceeds (other than escrowed funds to support obligations reasonably expected to be payable) received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of Borrower, in connection therewith after deducting therefrom only (i) the amount of any indebtedness secured by any Permitted Lien on any asset (other than (A) indebtedness owing to Lender hereunder or under the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such sale or disposition, (ii) fees, commissions and expenses related thereto and required to be paid by Borrower in connection with such sale or disposition and (iii) taxes paid or payable to any taxing authorities by Borrower in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of Borrower, and are properly attributable to such transaction.

"**Patient**" means any Person receiving Medical Services from any Hospital Subsidiary and all Persons legally liable to pay a Hospital Subsidiary for such Medical Services other than Insurers or Governmental Authorities.

"**Permitted Liens**" means:

(a)     Liens created by, under or in connection with this Agreement or the Loan Documents in favor of the Lender;

(b)     Liens created by the interests of lessors under operating leases which shall not exceed the related amounts provided in the HPA Cash Flow Forecast;

(c)     Liens for taxes or assessments or other government charges or levies not yet due and payable or if due and payable, Liens for taxes or assessments or other government charges or levies being contested by any HPA Party in good faith by appropriate proceedings, diligently prosecuted and for which adequate reserves have been established on such HPA Party's books in accordance with GAAP;

(d)     Liens under worker's compensation, unemployment insurance, social security or similar legislation;

(e)     Liens related to deposits or pledges made in the ordinary course of business (A) in connection with, or to secure payment of worker's compensation, unemployment insurance, social security or similar legislation, (B) in connection with insurance or (C) to secure indemnity, performance or other similar bonds (exclusive of obligations for the payment of borrowed money) in the ordinary course of business; provided that provisions for the payment of such Liens has been made on the books of such Person in accordance with GAAP;

4

(f)     Liens related to deposits or retainers for professionals, A&M and/or any claim agent;

(g)     Liens in respect of Property imposed by Law arising in the ordinary course of business such as materialmen's, mechanics', warehousemen's and other like Liens, provided that such Liens secure (i) only amounts not yet due and payable or (ii) amounts being contested in good faith by appropriate proceedings, diligently prosecuted, provided that adequate reserves have been established on the applicable HPA Party's books in accordance with GAAP and such Liens have been satisfied or bonded or otherwise stayed in operation or enforcement no later than thirty (30) days after the date of creation thereof, unless the aforementioned period shall be extended by the Lender upon request by the Borrower; and

(h)     Liens listed on Schedule 6.3 or reflected in the Lien Search (as hereinafter defined).

"**Person**" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**Property**" means any interest in any kind of property or assets, whether real, personal or mixed, and whether tangible or intangible and the proceeds, products, rents, cash and profits of all of the foregoing.

"**Real Property**" means real property of any Hospital Subsidiary, together with all buildings, structures and other improvements thereon, and all licenses, easements and appurtenances related thereto.

"**Responsible Officer**" shall mean W. Christopher Shea, Chief Legal Officer of Borrower.

"**River Oaks Judgment**" means any judgment that may be entered against Borrower in connection with the lawsuit filed by Oscar J. Barahona, Sr. et. al. against certain of the HPA Parties.

"**Security Agreement**" means that certain Pledge and Security Agreement dated the Closing Date by and between the Borrower and Lender, as the same may be amended, modified or restated from time to time.

## ARTICLE II.

## THE CREDIT

### SECTION 2.1    REVOLVING LINE OF CREDIT

(a)     Line of Credit. Subject to the terms and conditions of this Agreement, Lender hereby agrees to make advances to Borrower (each, an "Advance") from time to time up to and including October 15, 2008 (the "Maturity Date"), not to exceed at any time the aggregate principal amount of $900,000 (the "Line of Credit") (the "Maximum Amount"). Proceeds of the

5

Line of Credit shall be used solely to fund certain costs and expenses which may from time to time be incurred by the HPA Parties, in each case, which have been approved by A&M and shall not differ materially from the HPA Cash Flow Forecast, subject to the terms hereof. Borrower's obligation to repay Advances shall be evidenced by a promissory note substantially in the form of Exhibit A attached hereto (as it may be amended, the "Line of Credit Note"), all of the terms of which are incorporated herein by this reference. On the Maturity Date, any and all amounts outstanding under the Line of Credit shall be due and payable in full.

(b)    Borrowing and Repayment. Borrower may from time to time during the term of the Line of Credit borrow and partially or wholly repay its outstanding Advances, subject to all the limitations, terms and conditions contained herein or in the Line of Credit Note; provided however, that the total outstanding Advances shall not at any time exceed the Maximum Amount. Borrower cannot reborrow any amounts under the Line of Credit once such amounts have been repaid. Each time Borrower desires to borrow under the Line of Credit, Borrower shall submit to Lender a drawing request in substantially the form of Exhibit B (each, a "Drawing Request"), setting forth the amount requested to be borrowed. Borrower may submit Drawing Requests no more frequently than once each Business Day. Solely for ease of administration of the Line of Credit, Lender has established the Account to fund Advances made in accordance with the terms hereof; provided, however, that Lender reserves the right in its sole and absolute discretion to implement other procedures to fund Drawing Requests made in accordance with the terms hereof. If Lender determines that a Drawing Request has been made in accordance with the terms hereof, Lender shall cause the Account to be debited in the amount of the applicable Drawing Request and the loan proceeds shall be made available to Borrower.

### SECTION 2.2    INTEREST

(a)    Interest. Subject to Section 2.2(b), each Advance shall bear interest at a rate of 10.0% per annum from the date made. Lender shall provide to Borrower a monthly statement setting forth the calculation of the interest due and other charges owing by Borrower to Lender.

(b)    Default Interest. At all times when an Event of Default has occurred and is continuing, all amounts owed hereunder shall bear interest at a rate per annum equal to 12.0% (the "Default Rate"). Payment or acceptance of the Default Rate is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lender.

(c)    Computation and Payment. Interest on the principal amount outstanding under the Line of Credit shall be computed on the basis of a 360-day year, actual days elapsed and shall be payable on the Maturity Date.

### SECTION 2.3    MANDATORY PREPAYMENTS

No later than the third (3rd) Business Day following the date of receipt by Borrower of any Net Cash Proceeds, Borrower shall prepay the Advances in an aggregate amount equal to such Net Cash Proceeds, but solely to the extent that such Net Cash Proceeds are not subject to a valid and perfected Lien in existence on the Closing Date.

6

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES

Borrower makes the following representations and warranties to Lender, which representations and warranties shall survive the execution of this Agreement and shall continue in full force and effect until the full and final payment, and satisfaction and discharge, of all obligations of Borrower to Lender under this Agreement.

### SECTION 3.1    LEGAL STATUS; ORGANIZATIONAL DOCUMENTS

Each of the HPA Parties is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization or formation, and is qualified or licensed to do business, and is in good standing as a foreign corporation, limited liability company or limited partnership, if applicable, in all jurisdictions in which such qualification or licensing is required or in which the failure to so qualify or to be so licensed could reasonably be expected to have a Material Adverse Effect on the HPA Parties.

### SECTION 3.2    AUTHORIZATION AND VALIDITY

This Agreement, the Line of Credit Note, the Security Agreement and each other document, contract and instrument reasonably required by or at any time delivered to Lender in connection with this Agreement (with all of the foregoing referred to herein collectively as the "Loan Documents") have been duly authorized by Borrower, and upon their execution and delivery in accordance with the provisions hereof will constitute legal, valid and binding agreements and obligations of Borrower or the party which executes the same, enforceable in accordance with their respective terms.

### SECTION 3.3    NO VIOLATION

Except as set forth on Schedule 3.3, the execution, delivery and performance by Borrower of each of the Loan Documents to which it is a party does not violate any provision of any law or regulation, or contravene any provision of Borrower's constituent documents, or result in a breach of or constitute a default under any contract, obligation, indenture or other instrument to which Borrower is a party or by which Borrower or any of its properties may be bound.

### SECTION 3.4    HEALTHCARE REPRESENTATIONS AND WARRANTIES.

(a)    Reports. Except for matters that could not, in the aggregate, be reasonably expected to result in a liability to any Hospital Subsidiary in excess of $25,000, to the Knowledge of Borrower: (i) each Hospital Subsidiary has timely filed or caused to be timely filed, all cost reports and other reports of every kind whatsoever required by Law or by written or oral contracts or otherwise to have been filed or made with respect to such Hospital Subsidiary's business operations; (ii) there are no claims, actions or appeals pending (and no Hospital Subsidiary has filed any claims or reports which should result in any such claims, actions or appeals) before any commission, board or agency including without limitation any intermediary or carrier, the Provider Reimbursement Review Board or the Administrator of CMS, with respect

7

to any state or federal Medicare or Medicaid cost reports or claims filed by each Hospital Subsidiary, or any disallowance by any commission, board or agency in connection with any audit of such cost reports; and (iii) no validation review or program integrity review related to each Hospital Subsidiary, or the consummation of the transactions contemplated in the Financing Documents, or related to the Collateral, have been conducted by any commission, board or agency in connection with the Medicare or Medicaid programs, and to the Knowledge of the Borrower, no such reviews are scheduled, pending or threatened against or affecting any of any Hospital Subsidiary's employees or agents or the Collateral, or the consummation of the transactions contemplated hereby.

(b)  Compliance With Health Care Laws. To the Knowledge of the Borrower, without limiting the generality of Section 3.4(a) or any other representation or warranty made herein, each Hospital Subsidiary and each of such Hospital Subsidiary's licensed employees and contractors (other than contracted agencies) in the exercise of their respective duties on behalf of such Hospital Subsidiary, is in compliance with all applicable statutes, Laws, ordinances, rules and regulations of any governmental authority with respect to regulatory matters primarily relating to patient healthcare (including without limitation Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. Section 1320a-7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute," the Social Security Act, as amended, Section 1877, 42 U.S.C. Section 1395nn (Prohibition Against Certain Referrals), commonly referred to as "Stark Statute," and 31 U.S.C. §3729 et seq., commonly referred to as the "False Claims Act" (collectively, "Healthcare Laws")) except where such failure to comply would not reasonably be expected to result in a liability to any Hospital Subsidiary in excess of $75,000. To the extent applicable to the Hospital Subsidiary, to the Knowledge of the Borrower, each Hospital Subsidiary has maintained in all material respects all records required to be maintained by the Joint Commission (as hereinafter defined), the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy and the federal and state Medicare and Medicaid programs as required by the Healthcare Laws and, to the Knowledge of Borrower, there are no presently existing circumstances which would result or likely would result in material violations of the Healthcare Laws. Except as disclosed on Schedule 3.4(b), to the Knowledge of the Borrower, no Hospital Subsidiary is currently subject to any federal, state, local governmental or private payor civil or criminal investigations, inquiries or audits involving and/or related to its compliance with Healthcare Laws, or is currently subject to any federal, state or private payor inquiry, investigation, inspection or audit regarding its activities, including without limitation, an inquiry or investigation of any Hospital Subsidiary involving compliance with Healthcare Laws. To the Knowledge of the Borrower, no Hospital Subsidiary: (i) has had a civil monetary penalty assessed against it pursuant to 42 U.S.C. §1320a 7a; (ii) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b); (iii) has been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518; or (iv) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 et *seq.*

(c)  Licenses, Permits, and Certifications. To the Knowledge of Borrower, each Hospital Subsidiary has such permits, licenses, franchises, certificates and other approvals or authorizations of Governmental Authorities as are necessary under applicable Law or regulations

8

to own its properties and to conduct its business and to receive reimbursement under Medicare and Medicaid (including without limitation such permits as are required under such federal, state and other health care Laws, and under such HMO or similar licensure Laws and such insurance Laws and regulations, as are applicable thereto). To the Knowledge of Borrower, each Hospital Subsidiary has all Medicare, Medicaid and related agency supplier billing number(s) and related documentation necessary to submit reimbursement claims to Medicare and/or Medicaid for any Medical Service furnished by such Hospital Subsidiary in any jurisdiction where such Hospital Subsidiary conducts business. To the Knowledge of Borrower, each Hospital Subsidiary is not currently subject to, and never has been subject to, suspension, revocation, renewal or denial of its Medicare and/or Medicaid certification, supplier billing number(s), or Medicare and/or Medicaid participation agreement(s). To the Knowledge of Borrower, there currently exist no restrictions, deficiencies, required plans of corrective action or other such remedial measures with respect to Medicare and Medicaid certifications or state or local licensure of any Hospital Subsidiary other than restrictions, deficiencies, required plans of corrective action or other remedial measures that, individually and in the aggregate, are immaterial in nature, it being agreed that loss of any certification or accreditation issued by the Joint Commission (the "Joint Commission") shall be deemed material in nature.

(d)    HIPAA Compliance. To the Knowledge of Borrower, no HPA Party is the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could reasonably be expected to adversely affect any HPA Party's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by HPA Party of HIPAA.

### SECTION 3.5    SPECIAL REPRESENTATIONS AND WARRANTIES.

To the Knowledge of Borrower, to the extent a Hospital Subsidiary renders Medical Services, then:

(a)    Such Hospital Subsidiary is certified for participation in Medicare and Medicaid, and is a party to valid participation agreements for payments by Medicare and Medicaid program, which agreements are in full force and effect. Such Hospital Subsidiary has the requisite provider number or other healthcare permit to bill the Medicare program (to the extent such entity participates in the Medicare program), the respective Medicaid program in the state or states in which such entity operates (to the extent such entity participates in the Medicaid program in such state or states), and all other third party payor programs for which revenues were included in any financial projections delivered to Lender, except where the failure to have such healthcare permit would not have a material adverse effect on the Hospital Subsidiary taken as a whole. No Hospital Subsidiary has received notice of pending, threatened or possible investigation by, or loss of participation in, Medicare or Medicaid;

(b)    Each Hospital Subsidiary is the lawful owner of any license required for the provision of Medical Services at its Real Property. In the event that Lender acquires any of the Real Property through foreclosure or otherwise, neither any Hospital Subsidiary nor Lender, nor any purchaser of the Real Property (through a foreclosure or otherwise), must obtain a certificate

9

of need from any applicable state healthcare regulatory authority or agency (other than giving such notice required under the applicable state Law or regulation) prior to applying for and receiving a license to operate the Real Property and certification to receive Medicare and Medicaid payments (and any successor program) for patients having coverage thereunder, provided that neither the services offered at the Real Property nor the number of beds operated would be changed; and

(c)     The Facilities are currently accredited by the Joint Commission. The Hospital Subsidiaries have previously delivered to Lender, true, correct and complete copies of the most recent Joint Commission accreditation survey report and deficiency lists for all Real Property owned by any Hospital Subsidiaries, if any. To the Knowledge of Borrower, each of the Hospital Subsidiaries has cured all deficiencies or submitted a plan of correction to cure all deficiencies noted therein, if any, and such HPA Party has no reason to expect that its plans of correction will be disapproved by the Joint Commission.

### SECTION 3.6     HILL BURTON ACT.

To the Knowledge of Borrower, no Hospital Subsidiary nor any previous owner of any Real Property owned by a Hospital Subsidiary, has received any funding in connection with such Real Property under the federal Hill-Burton Act.

### SECTION 3.7     FUNDS FROM RESTRICTED GRANTS.

To the Knowledge of Borrower, none of the Real Property or the Collateral is subject to, and the Borrower shall, indemnify and hold Lender harmless from and against, any liability in respect of amounts received by the HPA Parties or others for the purchase or improvement of the Real Property or Collateral or any part thereof under restricted or conditioned grants or donations, including, without limitation, monies received under the Public Health Service Act, 42 U.S.C. Section 291 *et seq.*

### ARTICLE IV.

### CONDITIONS

### SECTION 4.1     CONDITIONS OF INITIAL EXTENSION OF CREDIT

The obligation of Lender to grant the Line of Credit shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Section 4.1.

(a)     Loan Documents.  There shall have been delivered to Lender an executed counterpart of each of the Loan Documents, in form and substance reasonably satisfactory to Lender.

(b)     Corporate Documents.  Lender shall have received such constituent documents of Borrower as Lender may reasonably request.

(c)     Officer's Certificate.  There shall have been delivered to Lender a certificate of a Responsible Officer of the Borrower, dated the Closing Date, stating that the representations and

10

warranties contained in Article 3 and in the other Loan Documents are true and correct in all material respects on such date as though made on and as of such date (provided that any representations and warranties which speak to a specific date shall remain true and correct in all material respects as of such specific date), all agreements and conditions required to be performed and complied with by such date have been performed and complied with and that no Default or Event of Default has occurred, or would occur as a result of the making of such Loan.

(d)   Resolutions.  There shall have been delivered to Lender copies, certified as of the Closing Date by the Secretary or an Assistant Secretary of the Borrower, of resolutions of the Board of Directors of the Borrower authorizing the execution, delivery and performance by the Borrower of the Loan Documents and, the borrowings and other extensions of credit hereunder; and, which, certificate shall include an Incumbency Certificate and state that such resolutions have not been modified, rescinded or amended and are in full force and effect on the date of such certification.

(e)   Litigation.  There shall not exist any action, suit, investigation, litigation or proceeding pending or threatened by or before any court, or any governmental, administrative or regulatory agency or authority, domestic or foreign, relating to the Loan Documents or the transactions contemplated hereby.

(f)   Silverpoint Release.  The Borrower shall have delivered or caused to be delivered to Lender a copy of a UCC-3 termination statement terminating the UCC-1 financing statement filed by Silver Point Finance, L.L.C. on August 21, 2006.

(g)   Lien Searches.  Subject to Section 5.7, Borrower shall have delivered or caused to be delivered to Lender copies of the results of a Lien search at the Secretary of State of the jurisdiction of incorporation, organization or formation with respect to each HPA Party (the "Lien Search"), which Lien Search shall have been initiated no earlier than August 28, 2008, and shall be in form and substance satisfactory to the Lender.

## SECTION 4.2   CONDITIONS OF EACH EXTENSION OF CREDIT

The obligation of Lender to make each extension of credit requested by Borrower hereunder shall be subject to the fulfillment to Lender's satisfaction of each of the following conditions:

(a)   Compliance.  The representations and warranties contained herein shall be true, correct and complete (and shall be deemed made) on and as of the date of the signing of this Agreement and on the date of each extension of credit by Lender pursuant hereto, with the same effect as though such representations and warranties had been made on and as of each such date, and on each such date, no Event of Default as defined herein, and no condition, event or act which with the giving of notice or the passage of time or both would constitute such an Event of Default, shall have occurred and be continuing or shall exist. Each request by Borrower for an extension of credit hereunder shall constitute a certification of Borrower that the conditions of this Section 4.2(a) are satisfied as of the date of such extension of credit.

(b)   Documentation.  Lender shall have received all additional documents which may be required in connection with such extension of credit.

11

## ARTICLE V.

## AFFIRMATIVE COVENANTS

Borrower covenants that so long as the Line of Credit remains available or any liabilities (whether direct or contingent, liquidated or unliquidated) of Borrower to Lender under any of the Loan Documents remain outstanding, and until payment in full of all obligations of Borrower subject hereto, Borrower shall:

### SECTION 5.1   PUNCTUAL PAYMENTS

Punctually pay the interest and principal in accordance with this Agreement and each of the other Loan Documents requiring any such payments at the times and place and in the manner specified therein, and any fees or other liabilities due under any of the Loan Documents at the times and place and in the manner specified therein.

### SECTION 5.2   ACCOUNTING RECORDS

Maintain adequate books and records in accordance with GAAP and in a manner otherwise acceptable to Lender, and permit any representative of Lender, at any reasonable time, to inspect, audit and examine such books and records, to make copies of the same, and to inspect the properties of the Borrower.

### SECTION 5.3   COMPLIANCE

Maintain all material licenses, permits, governmental approvals, rights, privileges and franchises necessary for the conduct of its business; and comply with the provisions of all documents pursuant to which Borrower is organized and/or which govern Borrower's continued existence and with the requirements of all laws, rules, regulations and orders of any Governmental Authority applicable to Borrower or its business.

### SECTION 5.4   INSURANCE

Maintain and keep in force insurance of the types and in amounts customarily carried in lines of business similar to the Borrower's, including but not limited to fire, extended coverage, public liability, property damage and workers' compensation, carried with companies and in amounts reasonably satisfactory to Lender.

### SECTION 5.5   ACCREDITATION AND LICENSING.

(a)     Use commercially reasonable efforts to cause each HPA Party to (i) obtain and maintain all certificates of need, provider numbers and permits and other licenses required to operate such HPA Party's business and its business locations under applicable Law and maintain such HPA Party's qualification for participation in, and payment under, Medicare, Medicaid and any other federal, state or local governmental program or private program providing for payment or reimbursement for services rendered by such Person except to the extent such loss or relinquishment could not reasonably be expected to have a material adverse effect on any HPA Party's business, operations, condition (financial or otherwise), prospects or properties, (ii) if

12

required by applicable Law, properly file all Medicaid/Medicare cost reports, and (iii) promptly furnish or cause to be furnished to the Lender copies of all reports and correspondence it sends or receives relating to any loss or revocation (or threatened loss or revocation) of any qualification described in this Section or any other violation or possible violation of Healthcare Laws. The HPA Parties will furnish and cause to be furnished to the Lender, within twenty (20) days of receipt by any HPA Party, a copy of any health care survey report related to licensure or certification (including, without limitation, an annual or biannual Medicare certification survey report) and any statement of deficiencies pertaining to any HPA Party or any of its subsidiaries; within the time period required by the particular agency for submission, the HPA Parties shall submit to Lender a copy of the Plan of Correction with respect thereto if such Plan of Correction is required by such agency issuing the statement of deficiency or notice of violation, if such deficiency or violation could adversely affect either the right to continue participation in Medicare, Medicaid or their reimbursement programs for existing and prospective patients result in the loss or suspension of any HPA Party's licenses and permits to operate its businesses.

    (b)    Use commercially reasonable efforts to cause each HPA Party to (i) provide Approved Goods or Services to its customers in compliance with ethical standards, Laws, rules and regulations applicable to it or any facility or location it operates; (ii) assure that each of its employees and each employee of such facility or location has all required licenses, credentials, approvals and other certifications to perform his or her duties and services for such location; and (iii) maintain all permits and other licenses required to operate its facilities and locations and conduct its business under applicable Law; except to the extent, with respect to each of clauses (i), (ii), and (iii) above, where the failure to comply, individually or in the aggregate, has not had and could not reasonably be expected to have or result in a material adverse effect on any HPA Party's business, operations, condition (financial or otherwise), prospects or properties.

    (c)    The Borrower shall notify Lender within two (2) Business Days following Borrower obtaining Knowledge of the occurrence of any of the following events: (1) the notification, through letter or otherwise, of a potential investigation relating to any HPA Party's submission of claims to Medicare, Medicaid or other governmental programs; or (2) the voluntary disclosure by HPA Party (or any subsidiary of any such HPA Party) to the Office of the Inspector General of the United States Department of Health and Human Services, a Medicare fiscal intermediary or any state's Medicaid program of a potential overpayment matter involving the submission of claims to such payor

### SECTION 5.6   HIPAA COMPLIANCE

To the extent that and for so long as Borrower is a "covered entity" within the meaning of HIPAA, Borrower (i) will implement policies that timely comply with HIPAA (as any deadlines thereunder may be formally or informally extended by the applicable Governmental Authority) and (ii) is and shall continue to be in compliance with each of the HIPAA provisions that relate to or regulate billing practices, procedures and codes.

### SECTION 5.7   POST-CLOSING DELIVERIES

The Borrower shall deliver to Lender within fifteen (15) days after the Closing Date:

107784.2
CURRENT 11812128v14

(a)    Copies of Lien Search results that were not obtained from the applicable Secretaries of State prior to the Closing Date and, if necessary, an updated version of Schedule 6.3 to reflect such results; and

(b)    updated versions of Schedules 6.2 and 6.4 in form and substance satisfactory to Lender; provided, that so long as the amount of additional obligations added to such schedules does not exceed $50,000 in the aggregate for each such schedule, the updated schedules shall be deemed to be satisfactory to Lender.

## ARTICLE VI.

## NEGATIVE COVENANTS

Borrower further covenants that so long as the Line of Credit remains available or any liabilities (whether direct or contingent, liquidated or unliquidated) of Borrower to Lender under any of the Loan Documents remain outstanding, and until payment in full of all obligations of Borrower hereunder, Borrower and the Management Subsidiaries will not, and Borrower shall use commercially reasonable efforts to cause the Hospital Subsidiaries not to, without the prior written consent of Lender:

### SECTION 6.1    USE OF FUNDS

Use any of the proceeds of the Line of Credit except for the purposes stated in Article II.

### SECTION 6.2    INDEBTEDNESS

Create, incur, assume or permit to exist any material indebtedness or material liabilities resulting from borrowings, loans or advances, whether secured or unsecured, matured or unmatured, liquidated or unliquidated, joint or several, except the liabilities of the HPA Parties to Lender under this Agreement, any other liabilities of any HPA Party existing as of the Closing Date and set forth on Schedule 6.2 (it being understood that Borrower is not required to list on such schedule any trade payables incurred in the ordinary course of business prior to the Closing Date) and indebtedness and liabilities incurred in the ordinary course of business consistent with past practice.

### SECTION 6.3    LIENS.

Create, incur, assume or suffer to exist any Lien upon or with respect to any of its Property (including without limitation motor vehicles) now owned or hereafter acquired, except for Permitted Liens and the Liens listed on Schedule 6.3 (it being understood that Borrower may satisfy this obligation by providing the Lien Search).

### SECTION 6.4    GUARANTIES

Guarantee or become liable in any way as surety, endorser (other than as endorser of negotiable instruments for deposit or collection in the ordinary course of business), accommodation endorser or otherwise for, nor pledge or hypothecate any assets of the Borrower or Management Subsidiaries as security for, any material liabilities or material obligations of any

14

other person or entity, except the guaranties made by the HPA Parties existing as of the Closing Date and set forth on Schedule 6.4, and guaranties made by the HPA Parties in the ordinary course of business consistent with past practice.

### SECTION 6.5    LOANS, ADVANCES, INVESTMENTS

Make any loans or advances to or investments in any person or entity, other than a Hospital Subsidiary; provided, however, that Borrower may make Advances to employees in the ordinary course of business not to exceed $25,000 in the aggregate at any one time.

### SECTION 6.6    [INTENIONALLY OMITTED].

### SECTION 6.7    SALES.

Sell, transfer, lease, assign, encumber or otherwise dispose of any Property, except in the ordinary course of business, without the prior written consent of the Lender (and no consent shall be inferred from any other action, inaction or acquiescence of the Lender).

### ARTICLE VII.

### EVENTS OF DEFAULT

### SECTION 7.1    EVENTS OF DEFAULT

The occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

(a)    Borrower shall fail to pay when due any principal, the amount of interest or any fees or other amounts payable under any of the Loan Documents;

(b)    Any representation or warranty made or deemed made by Borrower hereunder shall prove to be false, incorrect or incomplete in any material respect when furnished, made or deemed made;

(c)    Any default in the performance of or compliance with any obligation, agreement, covenant or other provision contained herein (other than those referred to in Sections 7.1(a) and (b) above) or under any other Loan Document; or

(d)    One or more judgments or orders for the payment of money in an amount that are unsatisfied that exceeds, individually or in the aggregate, $25,000 shall be entered against Borrower and (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order, (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect or (iii) results in the creation or imposition of a Lien upon any of the Property that is not a Permitted Lien; provided that no Event of Default shall be deemed to exist in respect of the River Oaks Judgment or Medistar Judgment, unless actions taken in respect of subsection (iii) have occurred and exist.

15

(e)      From and after the Closing Date and prior to the filing of the Case (if the Borrower determines to file the Case), there shall occur a (i) default in any payment of any indebtedness (other than as referred to in Section 7.1(a)) in excess of $25,000 beyond the period of grace, if any, provided in the instrument or agreement under which such indebtedness was created; (ii) default in the observance or performance of any other agreement or condition relating to any such indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto or any other event shall occur or condition exist, in each case the effect of which default or other event or condition is to cause or permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such indebtedness to become due prior to its stated maturity; or (iii) default in the observance or performance of any agreement or condition in any material agreement of any HPA Party which (A) continues beyond the period of grace and (B) could reasonably be expected to result in a liability to the HPA Parties, individually or in the aggregate, in excess of $25,000; provided, that no Event of Default shall be deemed to exist in respect of clauses (i), (ii) or (iii) above unless the applicable default results in the creation or imposition of a Lien upon any of the Property that is not a Permitted Lien or other remedies (other than the making of a filing in a court of competent jurisdiction solely for the preservation of a claim by an opposing party) have been exercised as a result of such default.

(f)      The institution by any Governmental Authority of criminal proceedings against the Borrower.

### SECTION 7.2     REMEDIES

If an Event of Default shall occur and so long as the same is continuing, (a) any indebtedness of Borrower under any of the Loan Documents, any term thereof to the contrary notwithstanding, shall, at Lender's option, become immediately due and payable without presentment, demand, protest or notice of dishonor, all of which are hereby expressly waived by Borrower; (b) the obligation, if any, of Lender to permit further borrowings hereunder shall immediately cease and terminate; and (c) Lender shall have all rights, powers and remedies available under each of the Loan Documents, or accorded by law, including without limitation the right to resort to any or all security for the Line of Credit and to exercise any or all of the rights of a beneficiary or secured party pursuant to applicable law. All rights, powers and remedies of Lender in connection with each of the Loan Documents may be exercised at any time by Lender and from time to time after the occurrence of an Event of Default and so long as the same is continuing, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

### ARTICLE VIII.

### MISCELLANEOUS

### SECTION 8.1     NO WAIVER

No delay, failure or discontinuance of Lender in exercising any right, power or remedy under any of the Loan Documents shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude,

16

waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver, permit, consent or approval of any kind by Lender of any breach of or default under any of the Loan Documents must be in writing and shall be effective only to the extent expressly set forth in such writing.

## SECTION 8.2   NOTICES

All notices, requests and demands which any party is required or may desire to give to any other party under any provision of this Agreement must be in writing delivered to each party at the following address:

BORROWER:  Hospital Partners of America, Inc.
2815 Coliseum Centre Drive
Suite 150
Charlotte, NC 28217
Facsimile Number: 704-423-8895
Phone: 704-424-6800

with a copy to:

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Attn: Martin R. Barash, Esq.
Facsimile Number: (310) 407-9090
Direct: (310) 407-4005

LENDER:  New Enterprise Associates 10, Limited Partnership
1119 St. Paul Street
Baltimore, MD 21202
Attn: Louis Citron
Facsimile Number: 410-752-7721
Telephone : 410-244-0115

With a copy to:

Proskauer Rose LLP
1585 Broadway
New York, New York 10036-8299
Attn: Jeffrey Levitan, Esq.
Facsimile Number: (212) 969-2900
Telephone: (212) 969-3000

or to such other address as any party may designate by written notice to all other parties. Each such notice, request and demand shall be deemed given or made as follows: (a) if sent by hand delivery, upon delivery; (b) if sent by mail, upon the earlier of the date of receipt or three (3) days after deposit in the U.S. mail, first class and postage prepaid; and (c) if sent by telecopy, upon receipt.

17

107784.2
CURRENT 11812128v14

### SECTION 8.3    INDEMNITY, COSTS, EXPENSES AND ATTORNEYS' FEES

Borrower shall indemnify Lender against, hold Lender harmless from, and pay to Lender immediately upon demand, the full amount of all costs and expenses, including reasonable attorneys' fees, incurred by Lender in connection with (a) Lender's administration of this Agreement and each of the other Loan Documents, and the preparation of this Agreement and the other Loan Documents and any amendments and waivers hereto and thereto, (b) the enforcement of Lender's rights and/or the collection of any amounts which become due to Lender under any of the Loan Documents (including in connection with any bankruptcy, reorganization, "work-out" or similar circumstance or proceeding) and (c) the prosecution or defense of any claim or action in any way related to any of the Loan Documents or the transactions contemplated thereby, including without limitation any action for declaratory relief.

### SECTION 8.4    SUCCESSORS, ASSIGNMENT

This Agreement shall be binding on and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that Borrower may not assign or transfer its interest hereunder without the prior written consent of Lender.

### SECTION 8.5    ENTIRE AGREEMENT; COUNTERPARTS; AMENDMENT

This Agreement and each of the other Loan Documents constitute the entire agreement between Borrower and Lender with respect to the Line of Credit and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. This Agreement may be executed and delivered electronically (including by pdf or fax) and in any number of counterparts. This Agreement may be amended or modified only by a written instrument executed by each party hereto.

### SECTION 8.6    GOVERNING LAW

This Agreement shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

*[Signature Page Follows]*

18

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

NEW ENTERPRISE ASSOCIATES 10, LIMITED PARTNERSHIP

By: NEA Partners 10, Limited Partnership, its
general partner

By: _Charles Newhall_

Name: Charles W. Newhall, III

Title: General Partner


HOSPITAL PARTNERS OF AMERICA, INC.

By: _W Ch Shea_

Name: W Christopher Shea

Title: Sr VP / Chief Legal Offr

# EXHIBIT A

## FORM OF LINE OF CREDIT NOTE

### LINE OF CREDIT PROMISSORY NOTE

New York, New York
September __, 2008

$[          ]

**FOR VALUE RECEIVED**, Hospital Partners of America, Inc., a Delaware corporation (the "Company"), promises to pay to the order of New Enterprise Associates 10, Limited Partnership, or order (collectively, "Payee"), on or before October 15, 2008, the lesser of (i) $900,000 and (ii) the unpaid principal amount of all advances made by Payee under the Line of Credit (as defined in the Credit Agreement referred to below).

The Company also promises to pay interest on the unpaid principal amount hereof from the Closing Date until paid in full at the rates and at the times which shall be determined in accordance with the provisions of that certain Credit Agreement, of even date herewith, by and between the Company and New Enterprise Associates 10, L.P. (such agreement, as it may be amended, modified or supplemented from time to time, the "Credit Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

This Note is the Company's "Line of Credit Note" and is issued pursuant to and entitled to the benefits of the Credit Agreement to which reference is hereby made for a more complete statement of the terms and conditions under which the advances evidenced hereby were made and are to be repaid.

All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds at the office of Payee located at 1119 St. Paul Street, Baltimore, Maryland 21202, or at such other place as shall be designated in writing for such purpose in accordance with the notice provisions of the Credit Agreement.

Whenever any payment on this Note shall be stated to be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest on this Note.

This Note is secured pursuant to the terms of the Security Agreement.

THIS NOTE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PROVISIONS.

Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note and all other obligations of the Company under the Credit Agreement,

A-1
**Error! Bookmark not defined.**

together with all accrued but unpaid interest thereon, may be declared to be due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

The terms of this Note are subject to amendment only in the manner provided in the Credit Agreement.

The obligation of the Company to pay the principal of and interest on this Note at the place, at the respective times, and in the currency herein prescribed is absolute and unconditional.

The Company promises to pay all costs and expenses, including all attorneys' fees and expenses, all as provided in the Credit Agreement, actually incurred in the collection and enforcement of this Note, including any such costs, expenses or fees actually incurred in any appeal in connection with the collection and enforcement of this Note. The Company hereby consents to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waives diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

IN WITNESS WHEREOF, the Company has caused this Note to be executed and delivered by its duly authorized officer, as of the day and year and at the place first above written.

HOSPITAL PARTNERS OF AMERICA, INC.

By:_  _____   _  _ __   ___   _ _ ..   __
      Name:
      Title:

## TRANSACTIONS ON LINE OF CREDIT NOTE

| Date | Amount of Loan Made This Date | Amount of Principal Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|------|------|------|------|

A-3

## EXHIBIT B

## FORM OF DRAWING REQUEST

Pursuant to that certain Credit Agreement, dated as of September 15, 2008 (as such agreement may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"; capitalized terms used herein without definition have the meanings ascribed to them in the Credit Agreement) by and between Hospital Partners of America, Inc., a Delaware corporation, and New Enterprise Associates 10, Limited Partnership ("Lender"), this represents Borrower's request for an advance under the Line of Credit on September ___ , 2008 in the amount of $___            ___. Each Advance outstanding under the Credit Agreement as of the Closing Date, without giving effect to the Advance requested hereunder, is as set forth on Attachment 1 hereto.

The undersigned hereby certifies that the undersigned is an authorized officer of Borrower and has read the conditions to all Advances contained in Section 4.2 of the Credit Agreement and any other definitions or provisions in the Credit Agreement relating thereto or to the statements contained herein and to the Knowledge of the undersigned, each of the conditions set forth in Section 4.2 of the Credit Agreement will be satisfied on and as of the date of the proposed advance.

**IN WITNESS WHEREOF**, I have executed this Drawing Request on behalf of Borrower as of this ___ day of _____ _, 2008.

HOSPITAL PARTNERS OF AMERICA, INC.

By: _____ ___ _____ __ __
    Name:
    Title:

The undersigned has reviewed and approved this Drawing Request:

ALVAREZ & MARSAL NORTH AMERICA LLC

By:___ _____ ___ __ __
Name:_ ___ __ _____ __
Title: ___ _____ _____
Date: _____ _ ___, 2008

**Attachment 1**

| Date | Amount of Loan Made This Date | Amount of Principal Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|------|------|------|------|

D-1

**Hospital Partners of America - Corporate HQ**                                                    *Confidential*
Weekly Cash Flow - Assumptions

### General
- This budget addresses HPA's funding needs through 9/26/2008.
- Please note that the HPA Board has not authorized a chapter 11 filing and any such filing will only be authorized upon approval by the HPA Board.
- Possible filing of Chapter 11 for HPA and certain intermediate holding companies during the week ending 9/26/2008.

### Cash Receipts
(1) **Management Fees**
- Shasta, St. Joseph, and Trinity pay 100% of management fees.
- Austin does not pay management fees due to an anticipated lack of funds at Austin.
- Fees based on one month lag, therefore payment for the month ending 8/31/208 is to be collected the week ending 9/19/2008.

(2) **I/C Payments- Health Claims**
- Reflects each entity's estimated weekly obligation for Great West, Unim, flexible spending accounts, disability, and other company-wide insurance (professional and general liability, etc.)
- Effective 8/14/2008 all payments for heath care plans were made from St. Josephs, Trinity, Austin and RHD directly to the health care benefits trust.
- Post filing approval will be requested from the Court for HPA to continue making payments for River Oaks pre-petition health care benefits.

(3) **I/C Payments- Other Expenses**
- Reflects limited ongoing payments by HPA on behalf of subsidiaries. Invoices received at corporate are to be sent to individual hospitals for payment.

### Cash Disbursements
(4) **Operating**
- Reflects the operating expenses of the Charlotte, NC corporate headquarters.
- Forecast based on historical run rates.
- Payroll estimate reflects July 2008 RIF and assumes current headcount.
- Compensation for J. Crudele, included in Purchased Services.

(5) **Debt Service & Balance Sheet**
- Reflects the debt service and balance sheet of the Charlotte, NC corporate headquarters. No payments are forecast post-filing.

**Facility Reimbursed Items**
(6) - Travel expenses of Charlotte 'staff' (non-executive) employees included in Corporate expenses.
- Other includes actual unforecast expenditures. No future amounts were forecast.

**Restructuring Costs**
(7) - Possible chapter 11 filing week ending 9/26/2008.
- The filing would result in the acceleration of certain pre-filing costs including all outstanding fees prefiling and increases in retainer amounts for KTBS and A&M of (~$260K) (~$400K), respectively; retainer and filing fees for Delaware counsel ($106); and a retainer for the noticing agent ($10K).
- Prior to filing professionals would be paid weekly.

**Hospital Partners of America - Corporate HQ**
Weekly Cash Flow Projections

*Confidential*

| ($ actual) | Notes | Sep-08 LTF 9/12/08 | Sep-08 LTF 9/19/08 | Sep-08 LTF 9/26/08 | Total CF |
|---|---|---|---|---|---|
| **Cash Receipts** | | | | | |
| **Management Fees** | | | | | |
| Mgmt Fees-ASH | $ | - | $   10,000 | $   - | $   10,000 |
| Mgmt Fees-ROH | | - | - | | - |
| Mgmt Fees-SRMC | | - | 210,000 | - | 210,000 |
| Mgmt Fees-SJMC | | - | 325,000 | - | 325,000 |
| Mgmt Fees-TMC | | - | 140,000 | - | 140,000 |
| Mgmt Fees-RHO | | - | - | - | - |
| Other Receipts | | - | 45,000 | - | 45,000 |
| Daily Overnight Investment Income | | 427 | 427 | 427 | 1,281 |
| **Total Management Fees** | (1) | 427 | 730,427 | 427 | 731,281 |
| | | | | | |
| I/C Payments- Health Claims | | | | | |
| I/C Payment-ASH | | - | - | - | - |
| I/C Payment-ROH | | - | - | - | - |
| I/C Payment-SRMC | | - | - | - | - |
| I/C Payment-SJMC | | - | - | - | - |
| I/C Payment-TMC | | - | - | - | - |
| I/C Payment-RHO/old TMC | | - | - | - | - |
| **Total I/C Payments- Health Claims** | (2) | - | - | - | - |
| | | | | | |
| I/C Payments- Other Expenses | | | | | |
| I/C Payment-ASH | | - | - | 30,660 | 30,660 |
| I/C Payment-ROH | | - | - | - | - |
| I/C Payment-SRMC | | - | - | 34,220 | 34,220 |
| I/C Payment-SJMC | | - | - | 115,220 | 115,220 |
| I/C Payment-TMC | | - | - | 36,740 | 36,740 |
| I/C Payment-RHO/old TMC | | - | - | - | - |
| **Total I/C Payments- Other** | (3) | - | - | 216,840 | 216,840 |
| | | | | | |
| **Total Cash Receipts** | | 427 | 730,427 | 217,267 | 948,121 |
| | | | | | |
| **Cash Disbursements** | | | | | |
| **Operating** | | | | | |
| Salary, Wages & Benefits | | 154,000 | 22,000 | 236,660 | 412,660 |
| Insurance | | 7,260 | 30,000 | 7,260 | 44,520 |
| Supplies | | 1,400 | 1,400 | 1,400 | 4,200 |
| Purchased Services | | 45,000 | 95,000 | 45,000 | 185,000 |
| Capex, Repairs & Maintenance | | - | - | - | - |
| Utilities | | 7,400 | - | 7,400 | 14,800 |
| Rents & Leases | | - | - | - | - |
| Other Expenses | | 5,154 | 5,154 | 5,154 | 15,462 |
| Travel | | 2,000 | 2,000 | 2,000 | 6,000 |
| HMS/Perot Support Fee | | - | - | - | - |
| Contingency | | - | 100,000 | - | 100,000 |
| **Total Operating** | (4) | 222,214 | 255,554 | 304,874 | 782,642 |
| | | | | | |
| Debt Service & Balance Sheet | | | | | |
| Corp Balance Sheet Items | | - | - | - | - |
| Debt Principal Payments | | - | - | - | - |
| Debt Interest Payments | | - | - | - | - |
| **Total Debt Service/Balance Sheet** | (5) | - | - | - | - |
| | | | | | |
| **Facility Reimbursed Items** | | | | | |
| PDS | | - | - | - | - |
| PartnerSource | | - | - | - | - |
| Providence Claims | | - | - | - | - |
| Other | | - | - | - | - |
| Vision Service Plan | | - | - | - | - |
| Fac Disability Ins Payments | | - | - | - | - |
| Fac Flex Spending Payments | | - | - | - | - |
| Fac Health Ins Claims-Non Corp | | - | - | - | - |
| Fac Great West Premiums | | - | - | - | - |
| Fac Unum Premiums | | - | - | - | - |
| Fac Casualty Ins Payments | | - | - | 344,580 | 344,580 |
| Funding of River Oaks- Exp & Payroll | | - | - | - | - |
| **Total Facility Reimbursed Items** | (6) | - | - | 344,580 | 344,580 |

9/12/208  12:08 PM

*Preliminary Draft - Subject to Change*

**Hospital Partners of America - Corporate HQ**
Weekly Cash Flow Projections

*Confidential*

| ($ actual) | Notes | Sep-08 LTD 9/12/08 | Sep-08 LTF 9/19/08 | Sep-08 LTF 9/26/08 | Total CF |
|---|---|---|---|---|---|
| **Restructuring Costs** | | | | | |
| **Debtor Advisors** | | | | | |
| Klee Tuchin | | 44,622 | 260,000 | - | 304,622 |
| Alvarez & Marsal | | 195,309 | 400,000 | - | 595,309 |
| Kurtzman Carson | | - | 10,000 | - | 10,000 |
| Trustee fees & costs | | - | - | - | - |
| Delaware counsel (Pachulski) | | - | 106,234 | - | 106,234 |
| Moore Van Allen | | - | 75,000 | - | 75,000 |
| **Unsecured Advisors** | | | | | 0 |
| Legal counsel (Local) | | - | - | - | - |
| Legal counsel | | - | - | - | - |
| Financial consultants | | - | - | - | - |
| **Other Expenses** | | | | | 0 |
| Utility Deposits | | - | - | - | - |
| Miscellaneous Expenses | | - | 20,000 | - | 20,000 |
| **Total Restructuring Costs** | (7) | 239,931 | 871,234 | - | 1,111,165 |
| **Total Disbursements** | | 462,145 | 1,126,788 | 649,454 | 2,238,387 |
| **Net Cash Flow** | | $ (461,718) $ | (395,351) $ | (432,187) | $ (1,290,266) |
| **Beginning Cash in Bank** | | 232,631 | | | 232,631 |
| **Cumulative Net CF** | | $ (229,088) $ | (625,449) $ | (1,057,636) | $ (1,057,636) |

BANKRUPTCY
FILING DATE *

* If Chapter 11 filing is 9/23 (Tuesday), predicted funding need will be approximately $1.1 million.        OK

*Preliminary Draft - Subject to Change*

**Hospital Partners of America**                                                                                          *Confidential*
6.2 Schedule of Indebtedness, balances as of 7/31/2008

| Entity | Lender | Items Financed | Orig. Date | Maturity Date | Type | Balances per GL |
|---|---|---|---|---|---|---|
| ASH | TK1 Rollingwood | Building | 11/1/2002 | 10/1/17 | Cap Lease | $ 4,145,236 |
| ASH | GE Equip | Equipment | 10/1/2003 | 3/5/09 | Cap Lease | 2,390,515 |
| ASH | TK1 Axiom | Tenant Upfit Capital | 6/1/2004 | 11/1/17 | Cap Lease | 2,556,044 |
| ASH | Marcap | Equipment | 2/5/2008 | 2/5/13 | Note Payable | 207,601 |
| ASH | Merrill Lynch Revolver | A/R | 12/31/2003 | 11/30/11 | Revolver | 1,696,432 |
| **Total ASH** | | | | | | **10,995,828** |
| SRMC | SWBT (Amegy) | Original Equipment | 7/15/2004 | 7/14/09 | Note Payable | 5,746,322 |
| SRMC | MPT | Building | 8/10/2007 | 8/10/22 | Note Payable | 59,571,626 |
| SRMC | MPT | Commitment Fee Note | 8/10/2007 | 8/10/22 | Note Payable | 600,000 |
| SRMC | Tenet | Facility | 7/15/2004 | 7/15/08 | Note Payable | 4,250,000 |
| SRMC | Swearingen | Software | 11/2/2007 | 11/2/09 | Note Payable | 116,408 |
| SRMC | Shared Imaging | MRI Lease | 6/14/2005 | 6/14/10 | Cap Lease | 400,087 |
| SRMC | Toshiba | 64 Slice CT Scan Lease | 3/1/2006 | 5/1/11 | Cap Lease | 1,138,717 |
| SRMC | Marcap | 3100 Innova System Lease | 3/1/2006 | 2/28/10 | Cap Lease | 567,724 |
| SRMC | GE | Vascular Lab Imaging | 4/1/2007 | 3/1/12 | Cap Lease | 581,566 |
| SRMC | Siemens | Nuc Med Camera | 6/30/2008 | 6/30/12 | Cap Lease | 336,679 |
| SRMC | GE Revolver | A/R | 7/15/2004 | 7/15/10 | Revolver | 11,319,221 |
| **Total SRMC** | | | | | | **84,628,350** |
| SJMC | Merrill Lynch Term A | Facility | 8/21/2006 | 8/21/11 | Note Payable | 74,133,333 |
| SJMC | Silverpoint as Agent | Facility | 8/21/2006 | 8/21/11 | Note Payable | 35,000,000 |
| SJMC | Kronos | Timekeeping Software Licenses | 8/1/2006 | 8/1/08 | Cap Lease | 4,410 |
| SJMC | IBM Credit | GE CT Scan | 11/1/2006 | 11/1/11 | Cap Lease | 1,000,201 |
| SJMC | IBM Credit | Cisco Integrated Service | 12/1/2006 | 12/1/11 | Cap Lease | 149,285 |
| SJMC | IBM Credit | Alpha Server | 11/1/2006 | 11/1/11 | Cap Lease | 352,020 |
| SJMC | IBM Credit | Ultrasound | 6/30/2007 | 7/1/12 | Cap Lease | 393,429 |
| SJMC | IBM Credit | Brainlab | 6/1/2007 | 7/1/12 | Cap Lease | 243,330 |
| SJMC | Dell | Capital Leases from Christus Acquisition | | | Cap Lease | 7,785 |
| SJMC | Sales Tax Lease | IBM Credit Vendor Sales Tax | 6/19/2007 | 9/1/12 | Cap Lease | 20,516 |
| SJMC | Siemens | Cath Lab DTA Lease | 10/1/2007 | 9/1/14 | Cap Lease | 1,277,601 |
| SJMC | Siemens | Axiom Sensis Lease | 10/1/2007 | 9/1/14 | Cap Lease | 42,671 |
| SJMC | Siemens | Sensis Artis DTA Lease | 6/1/2007 | 5/1/14 | Cap Lease | 88,458 |
| SJMC | Siemens | Sensis HICOR Lease | 10/1/2007 | 9/1/14 | Cap Lease | 99,350 |

9/11/2008  2:57 PM
Debt Summary of Terms 2008-07 short

*Preliminary Draft - Subject to Change*

**Hospital Partners of America**

6.2 Schedule of Indebtedness, balances as of 7/31/2008

*Confidential*

| Entity | Lender | Items Financed | Orig. Date | Maturity Date | Type | Balances per GL |
|---|---|---|---|---|---|---|
| SJMC | Siemens | Syngo Dynamics Lease | 10/1/2007 | 9/1/14 | Cap Lease | 115,712 |
| SJMC | Siemens | PET/CT | 4/1/2008 | 3/1/15 | Cap Lease | 1,798,911 |
| SJMC | Siemens | PET/CT Construction | 4/1/2008 | 5/1/15 | Cap Lease | 403,001 |
| SJMC | ML Revolver | A/R | 8/21/2006 | 8/21/11 | Revolver | 18,657,957 |
| Total SJMC | | | | | | 133,787,972 |
| TMC | Merrill Lynch Revolver | A/R | 3/9/2008 | | Revolver | 1,405,431 |
| Total TMC | | | | | | 1,405,431 |
| CORP | HPA Todd and Terry Notes | Refin of HPA Loans Holding | 4/16/2008 | 8/18/11 | Note Payable | 650,000 |
| CORP | Microsoft | Licenses Lease | 10/1/2005 | 10/1/08 | Note Payable | 23,752 |
| CORP | Delage | SJMC Microsoft Licenses | 11/13/2006 | 10/13/09 | Note Payable | 269,171 |
| CORP | Great America #2 | Office Furniture | 9/21/2006 | 9/21/08 | Cap Lease | 161 |
| CORP | Great America #3 | Office Furniture | 11/8/2006 | 11/8/08 | Cap Lease | 393 |
| CORP | CD Capital | Copier Lease | 6/30/2006 | 5/30/11 | Cap Lease | 18,720 |
| CORP | Siemens (equip. at ROH) | Equipment | 9/1/2004 | 12/24/09 | Note Payable | 257,137 |
| Total Corp | | | | | | 1,219,335 |
| Total Debt All Facilities | | | | | | $ 232,036,916 |

*Preliminary Draft - Subject to Change*

**Confidential**

**Hospital Partners of America**
6.4 Schedule of Guarantees (HPA & Intermediate Subs)

| Primary Borrower | Lender | Guarantor | Guarantee Secured | Classification | Balance as of | $ | Est. Recovery | Claim Amount | Comments |
|---|---|---|---|---|---|---|---|---|---|
| ASH | GE Equip | ASH Holdings | No | Cap Lease | 7/30/08 | 2,390,515 | 100% | - | |
| ASH | GE Equip | ASH Management | No | Cap Lease | 7/30/08 | 2,390,515 | 100% | - | |
| ASH | GE Equip | HPA | No | Cap Lease | 7/30/08 | 2,390,515 | 100% | - | |
| ASH | GE (f/k/a Merrill Lynch) A/R | ASH Holdings | No | Revolver | 7/30/08 | 1,696,432 | 100% | - | A/R financing |
| ASH | GE (f/k/a Merrill Lynch) A/R | ASH Management | No | Revolver | 7/30/08 | 1,696,432 | 100% | - | A/R financing |
| ASH | GE (f/k/a Merrill Lynch) A/R | HPA | No | Revolver | 7/30/08 | 1,696,432 | 100% | - | A/R financing |
| ASH | TK1 Rollingwood | HPA | No | Cap Lease | 7/30/08 | 4,145,236 | 100% | - | A/R financing |
| ROH | Anegy f/k/a SWBT | HPA | No | Note Payable | 7/2/08 | 1,593,523 | 15% | 1,354,494.6 | Equipment |
| ROH | Anegy f/k/a SWBT #2 | HPA | No | Note Payable | 7/2/08 | 303,287 | 15% | 257,793.5 | Equipment |
| ROH | GE | HPA | No | Note Payable | 7/2/08 | 1,585,140 | 15% | 1,347,369.0 | Equipment |
| ROH | GE (f/k/a Merrill Lynch) A/R | HPA | No | Revolver | 7/2/08 | 14,317,243 | 100% | - | A/R financing |
| ROH | GE Fetal Monitors | HPA | No | Note Payable | 7/2/08 | 139,587 | 15% | 118,649.2 | Fetal monitors |
| ROH | GE QS System | HPA | No | Note Payable | 7/2/08 | 119,274 | 15% | 101,383.3 | QS System |
| ROH | IBM Credit, LC | HPA | No | Cap Lease | 7/2/08 | 397,140 | 15% | 337,569.3 | Equipment |
| ROH | Hitachi Capital America Corp a/k/a SMT Leasing #1 | HPA | No | Note Payable | 7/2/08 | 481,429 | 15% | 409,214.3 | Equipment |
| ROH | Hitachi Capital America Corp a/k/a SMT Leasing #2 | HPA | No | Note Payable | 7/2/08 | 234,360 | 15% | 199,206.2 | Equipment |
| ROH | Hitachi Capital America Corp a/k/a SMT Leasing #3 | HPA | No | Note Payable | 7/2/08 | 128,680 | 15% | 109,378.1 | Equipment |
| ROH | Hitachi Capital America Corp a/k/a SMT Leasing #4 | HPA | No | Note Payable | 7/2/08 | 90,279 | 15% | 76,737.4 | Equipment |
| ROH | Medistar - ROPP ASC | HPA | No | RE Lease | 7/2/08 | 1,912,000 | 0% | 15,522,084.0 | Total remaining lease obligation |
| ROH | Medistar - ROPP General Use | HPA | No | RE Lease | 7/2/08 | 739,000 | 0% | 5,653,696.0 | Total remaining lease obligation |
| ROH | Medistar - ROPP Medical Use | HPA | No | RE Lease | 7/2/08 | 336,000 | 0% | 1,620,260.0 | Total remaining lease obligation |
| ROH | Medistar - Dairy Ashford | HPA | No | RE Lease | 7/2/08 | 2,412,000 | 0% | 19,483,052.0 | Total remaining lease obligation |
| ROH | MPT | HPA | Yes | RE Lease | 7/2/08 | 42,800,000 | 0% | 42,800,000.0 | Total remaining lease obligation |
| ROH | MPT | SMRC Management | Yes | RE Lease | 7/2/08 | 42,800,000 | 0% | 42,800,000.0 | Remaining lease obligation |
| ROH | MPT | HPA | Yes | Note Payable | 7/2/08 | 400,000 | 0% | 400,000.0 | Commitment fee note |
| ROH | MPT | SMRC Management | Yes | Note Payable | 7/2/08 | 400,000 | 0% | 400,000.0 | Commitment fee note |
| SJMC | GE (f/k/a Merrill Lynch Capital) First Lien Term Loan | HPA | No | Note payable | 7/30/08 | 74,133,333 | 100% | - | $20MM - Siemens / $25MM - Marathon / $35MM Merrill Lynch |
| SJMC | GE (f/k/a Merrill Lynch Capital) First Lien Term Loan | SJMC Management | No | Note payable | 7/30/08 | 74,133,333 | 100% | - | $20MM - Siemens / $25MM - Marathon / $35MM Merrill Lynch |
| SJMC | Silverpoint (f/k/a Merrill Lynch Capital) Second Lien Term Loan | HPA | No | Note Payable | 7/30/08 | 35,000,000 | 100% | - | $8.75 - SPF CDO / $10.1 - Field Point I / $16.2 - Field Point II |
| SJMC | Silverpoint (f/k/a Merrill Lynch Capital) Second Lien Term Loan | SJMC Management | No | Note Payable | 7/30/08 | 35,000,000 | 100% | - | $8.75 - SPF CDO / $10.1 - Field Point I / $16.2 - Field Point II |

9/11/2008 2:56 PM
HPA Corporate Debt Tracking 2008-09-11 v2 RJM

*Preliminary Draft - Subject to Change*

*Confidential*

**Hospital Partners of America**
6.4 Schedule of Guarantees (HPA & Intermediate Subs)

| Primary Borrower | Lender | Guarantor | Guarantee Secured | Classification | as of | $ | Est. Recovery | Claim Amount Comments |
|---|---|---|---|---|---|---|---|---|
| SJMC | GE (f/k/a Merrill Lynch Capital) Revolving Loan | HPA | No | Revolver | 7/30/08 | 18,657,957 | 100% | - A/R Financing<br>- $20MM - MLC<br>- $5MM - Siemens |
| SJMC | GE (f/k/a Merrill Lynch Capital) Revolving Loan | SJMC Management | No | Revolver | 7/30/08 | 18,657,957 | 100% | - A/R Financing<br>- $20MM - MLC<br>- $5MM - Siemens |
| SJMC | IBM Credit | HPA | No | Revolver | 7/30/08 | 1,000,201 | 100% | - GE CT Scan |
| SJMC | IBM Credit | HPA | | | 7/30/08 | 149,285 | 100% | - Cisco integrated svc. |
| SJMC | IBM Credit | HPA | | | 7/30/08 | 352,020 | 100% | - Alpha server |
| SJMC | IBM Credit | HPA | | | 7/30/08 | 393,429 | 100% | - Ultrasound |
| SJMC | IBM Credit | HPA | | | 7/30/08 | 243,330 | 100% | - Brainlab |
| SRMC | GE | HPA | No | Cap lease | 7/30/08 | 581,566 | 100% | - Vascular lab imaging |
| SRMC | GE | SRMC Management | No | Cap lease | 7/30/08 | 581,566 | 100% | - Vascular lab imaging |
| SRMC | GE (f/k/a Merrill Lynch) A/R | HPA | No | Revolver | 7/30/08 | 11,319,221 | 100% | - A/R financing |
| SRMC | Marcap | HPA | No | Cap lease | 7/30/08 | 567,724 | 100% | - Innova system lease |
| SRMC | MPT | HPA | Yes | RE Lease | 7/30/08 | 59,571,626 | 100% | - Building |
| SRMC | MPT | SMRC Management | Yes | RE Lease | 7/30/08 | 59,571,626 | 100% | - Building |
| SRMC | MPT | HPA | Yes | Note payable | 7/30/08 | 600,000 | 100% | - Commitment fee note |
| SRMC | MPT | SMRC Management | Yes | Note payable | 7/30/08 | 600,000 | 100% | - Commitment fee note |
| SRMC | SWBT (Amegy) | HPA | No | Note payable | 7/30/08 | 5,746,322 | 100% | - Original equipment |
| SRMC | Tenet | HPA | No | Note payable | 7/30/08 | 4,250,000 | 100% | - Facility |
| TMC | GE (f/k/a Merrill Lynch) A/R | HPA | No | Revolver | 7/30/08 | 1,405,431 | 100% | - A/R financing |
| TMC | Metrocrest Lease | HPA | No | | 7/30/08 | n/a | 100% | - Lease |

**Key:**

| | |
|---|---|
| HPA | Hospital Partners of America, Inc. |
| ASH | Surgical Hospital of Austin, L.P. |
| ASH Holdings | Austin Surgical Hospital Holdings, Inc. |
| ASH Management | Surgical Hospital of Austin Management, Inc. |
| ROH | River Oaks Medical Center, L.P. |
| SJMC | SJ Medical Center, LLC d/b/a St. Joseph Medical Center |
| SJMC Management | SJ Medical Center Management, LLC |
| SRMC | Shasta Regional Medical Center, LLC |
| SRMC Management | SRMC Management, Inc. |
| TMC | Trinity MC, LLC |
| TMC Management | Trinity MC Management, LLC |