# EXHIBIT 3

Execution Version

## PLEDGE AND SECURITY AGREEMENT

This PLEDGE AND SECURITY AGREEMENT, dated as of September 15, 2008 (together with all amendments, if any, from time to time hereto, this "Agreement") among Hospital Partners of America, Inc., a Delaware corporation ("HPA"), Trinity MC Management, LLC, a Texas limited liability company ("Trinity" and, together with HPA, the "Pledgors," and each a "Pledgor"), and New Enterprise Associates 10, Limited Partnership, a Delaware limited partnership, as Lender ("Lender").

### WITNESSETH:

WHEREAS, pursuant to that certain Credit Agreement dated as of the date hereof by and between the HPA and the Lender (including all annexes, exhibits and schedules thereto, and as from time to time amended, restated, supplemented or otherwise modified (the "Credit Agreement")), the Lender has agreed to make loans and advances to the Pledgor;

WHEREAS, the Pledgors are the record and beneficial owner of the shares of Stock (as defined below) listed in Schedule I hereto and HPA and Trinity owns all right title and interest in and to the Net Cash Proceeds;

WHEREAS, Trinity is a wholly-owned subsidiary of HPA and as such will derive direct and indirect economic benefits from the making of the Advances and other financial accommodations provided to HPA pursuant to the Credit Agreement;

WHEREAS, in order to induce the Lender to make the advances as provided for in the Credit Agreement, the Pledgors have agreed to pledge the Pledged Collateral (as defined below) to the Lender in accordance herewith;

NOW, THEREFORE, in consideration of the premises and the covenants hereinafter contained and to induce the Lender to make advances under the Credit Agreement, it is agreed as follows:

1.    Definitions. Unless otherwise defined herein, terms defined in the Credit Agreement are used herein as therein defined, and the following shall have (unless otherwise provided elsewhere in this Agreement) the following respective meanings (such meanings being equally applicable to both the singular and plural form of the terms defined):

"Bankruptcy Code" means title 11, United States Code, as amended from time to time, and any successor statute thereto.

"Pledged Collateral" has the meaning assigned to such term in Section 2 hereof.

"Pledged Entity" means an issuer of Pledged Shares.

"Pledged Shares" means the Stock issued by the issuers listed on Schedule I hereto owned by HPA.

"Secured Obligations" has the meaning assigned to such term in Section 3 hereof.

"Stock" means all shares, options, warrants, general or limited partnership interests,

membership interests, units or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting.

2.    Pledge. Each Pledgor, as applicable, hereby pledges to the Lender, and grants to the Lender, a security interest in all of the following (collectively, the "Pledged Collateral"):

(a) the Pledged Shares and the certificates, if any, representing the Pledged Shares, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Shares and all proceeds thereof;

(b) all additional shares of Stock of a Pledged Entity from time to time acquired by such Pledgor in any manner (which shares shall be deemed to be part of the Pledged Shares), and the certificates, if any, representing such additional shares, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Stock and all proceeds thereof; and

(c) all of HPA's and Trinity's right, title and interest in and to the Net Cash Proceeds realized from the sale or other disposition of any Stock (other than the Pledged Shares) received or receivable or otherwise distributed to the Pledgor in respect of such Stock and all accounts, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for such Net Cash Proceeds and all proceeds thereof.

Notwithstanding the foregoing, the Pledged Collateral shall not include any rights or interests in any Property if under the terms of any contract, lease, permit, license, charter or license agreement, or any law with respect thereto, the valid grant of a security interest or Lien therein to Lender is prohibited and such prohibition has not been or is not waived or the consent of the other party to such contract, lease, permit, license, charter or license agreement has not been or is not otherwise obtained or under any law such prohibition cannot be waived, provided that the foregoing exclusion shall in no way be construed (a) to apply if any such prohibition is ineffective or unenforceable under Sections 9-406, 9-407, 9-408 or 9-409 of the UCC or other law or (b) so as to limit, impair or otherwise affect Lender's unconditional continuing security interests in and Liens upon any rights or interests of Pledgors in or to monies due or to become due in respect of such Property.

3.    Security for Obligations. This Agreement secures, and the Pledged Collateral is security for, the prompt payment in full when due, whether at stated maturity, by acceleration or otherwise, and performance of all of HPA's obligations of any kind under or in connection with the Credit Agreement and the other Loan Documents and all obligations of the Pledgors now or hereafter existing under this Agreement including, without limitation, all fees, costs and expenses due Lender whether in connection with collection actions hereunder or otherwise (collectively, the "Secured Obligations").

4.    Delivery of Pledged Collateral. All certificates, if any, evidencing the Pledged Collateral shall be delivered to and held by or on behalf of the Lender pursuant hereto. All Pledged Shares shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Lender.

5.    Representations and Warranties. Each Pledgor represents and warrants to the Lender, as applicable, that:

(a) Pledgor is, and at the time of delivery of the Pledged Shares to the Lender will be, the sole holder of record and the sole beneficial owner of such Pledged Collateral pledged by Pledgor free and

clear of any Lien thereon or affecting the title thereto.

(b) All of the Pledged Shares have been duly authorized, validly issued and are fully paid and non-assessable and are not subject to the preemptive rights of any Person. All other shares of Stock constituting Pledged Collateral will be duly authorized and validly issued, fully paid and nonassessable and not subject to the preemptive rights of any Person.

(c) Pledgor has the right and requisite authority to pledge, assign, transfer, deliver, deposit and set over the Pledged Collateral pledged by Pledgor to the Lender as provided herein.

(d) None of the Pledged Shares have been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject.

(e) All of the Pledged Shares of Surgical Hospital of Austin Management, Inc. and Austin Surgical Hospital Holdings, Inc. are presently owned by Pledgor, and are presently represented by the certificates listed on Schedule 1 hereto. None of the Pledged Shares of Trinity MC Management, LLC are evidenced by any certificate issued by Trinity MC Management, LLC and are not securities under §8-103(c) of the Uniform Commercial Code in effect from time to time in the state of New York (the "UCC"). There are no existing options, warrants, calls or commitments of any character whatsoever relating to the Pledged Shares.

(f) No consent, approval, authorization or other order or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required (i) for the pledge by Pledgor of the Pledged Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by Pledgor or (ii) for the exercise by the Lender of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

(g) This Agreement creates a valid security interest in favor of the Lender in the Pledged Collateral. The taking possession by or on behalf of the Lender of the certificates, if any, representing Pledged Shares and all other certificates and instruments constituting Pledged Collateral will perfect and establish the priority of the Lender's security interest in such Pledged Collateral and, the proper filing or registration of a financing statement under the UCC will perfect and establish the priority of the Lender's security interest in all other Pledged Collateral (including in Pledged Shares that are not represented by a certificate or other instrument). Except as set forth in this Section 5(g), no action is necessary to perfect or otherwise protect such security interest.

(h) The exercise by the Lender of its rights and remedies hereunder will not violate any law or governmental regulation or any material contractual restriction binding on or effecting Pledgor or any of its Property.

(i) The Pledged Shares of each Pledged Entity specifically identified on Schedule 1 hereto constitute 100% of the equity interest of each such Pledged Entity held by Pledgor.

The representations and warranties set forth in this Section 5 shall survive the execution and delivery of this Agreement.

6.    Covenants. Each Pledgor covenants and agrees, as applicable, that:

(a)  Without the prior written consent of the Lender, Pledgor will not sell, assign, transfer, pledge, or otherwise encumber any of its rights in or to the Pledged Collateral, or any unpaid dividends, interest or other distributions or payments with respect to the Pledged Collateral or grant a Lien in the Pledged Collateral, unless otherwise expressly permitted by the Credit Agreement.

(b)  Pledgor will, at its expense, promptly execute, acknowledge and deliver all such instruments and take all such actions as the Lender from time to time may request in order to ensure to the Lender the benefits of the Liens in and to the Pledged Collateral intended to be created by this Agreement, including the filing of any necessary UCC financing statements, which may be filed by the Lender with or (to the extent permitted by law) without the signature of Pledgor, and will cooperate with the Lender, at Pledgor's expense, in obtaining all necessary approvals and making all necessary filings under federal, state, local or foreign law in connection with such Liens or any sale or transfer of the Pledged Collateral. Lender is authorized to file financing statements, continuation statements and other documents under the UCC relating to the Collateral without Pledgor's signature naming Pledgor as debtor and Lender as secured party.

(c)  Pledgor has and will warrant and defend the title to and ownership of the Pledged Collateral and the Liens of the Lender at Pledgor's own expense in the Pledged Collateral against the claim of any Person and will maintain and preserve such Liens and keep the Pledged Collateral free from all Liens other than Permitted Liens.

(d)  Pledgor will, upon obtaining ownership of any additional Stock instruments of a Pledged Entity or Stock otherwise required to be pledged to the Lender pursuant to any of the Loan Documents, which Stock is not already Pledged Collateral, promptly (and in any event within three (3) Business Days) deliver to the Lender a Pledge Amendment, duly executed by Pledgor, in substantially the form of Schedule II hereto (a "Pledge Amendment"), in respect of any such additional Stock pursuant to which Pledgor shall pledge to the Lender all of such additional Stock and if applicable, accompanied by certificates evidencing such additional Stock and executed stock powers in blank.  Pledgor hereby authorizes the Lender to attach each Pledge Amendment to this Agreement and agrees that all Pledged Shares listed on any Pledge Amendment delivered to the Lender shall for all purposes hereunder be considered Pledged Collateral.

(e)  Pledgor will mark its books and records (and shall cause the issuer of the Pledged Shares to mark its books and records) to reflect the security interest granted to the Lender pursuant to this Agreement and shall keep and maintain reasonably satisfactory and complete records of the Pledged Collateral, including, without limitation, a record of all payments received in respect thereof.

(f)  Pledgor will not make or consent to any amendment or other modification or waiver with respect to any of the Pledged Collateral or enter into any agreement or allow to exist any restriction with respect to any of the Pledged Collateral other than pursuant hereto or as may be permitted under the Credit Agreement.

(g)  Pledgor shall advise Lender promptly, in reasonable detail, of any Lien (other than Permitted Liens) on, or claim asserted against, any of the Pledged Collateral.

7.      Pledgor's Rights.  As long as no Event of Default shall have occurred and be continuing and until written notice shall be given to Pledgor in accordance with Section 8(a) hereof:

(a)  Each Pledgor, as applicable, shall have the right, from time to time, to vote and give consents with respect to the Pledged Collateral, or any part thereof for all purposes not inconsistent with the provisions of this Agreement, the Credit Agreement or any other Loan Document; provided, however,

Error! No document variable supplied.

5516/54415-004 Current/11836804v10

that no vote shall be cast, and no consent shall be given or action taken, which would have the effect of impairing the position or interest of the Lender in respect of the Pledged Collateral.

(b) (i)  Each Pledgor, as applicable, shall be entitled, from time to time, to collect and receive for its own use all cash dividends, distributions and interest paid in respect of the Pledged Shares to the extent such cash dividends, distributions and interest are allowed under the Credit Agreement other than any and all dividends, distributions and interest paid or payable other than in cash in respect of any Pledged Collateral, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral; provided, however, that until actually paid all rights to such distributions shall remain subject to the Lien created by this Agreement; and

(ii)  all dividends, distributions and interest (other than such cash dividends, distributions and interest as are permitted to be paid to such Pledgor in accordance with clause (i) above) and all other distributions in respect of any of the Pledged Shares, whenever paid or made, shall be delivered to the Lender to hold as Pledged Collateral and shall, if received by such Pledgor, be received in trust for the benefit of the Lender, be segregated from the other property or funds of such Pledgor, and be forthwith delivered to the Lender as Pledged Collateral in the same form as so received (with any necessary endorsement).

8.     Defaults and Remedies; Proxy.

(a) Pledged Stock.

(i)     Upon the occurrence of an Event of Default and during the continuation of such Event of Default, and concurrently with written notice to the Pledgors, the Lender (personally or through an agent) is hereby authorized and empowered to transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations, to exercise the voting and all other rights as a holder with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon, to sell in one or more sales after ten (10) days' notice of the time and place of any public sale or of the time at which a private sale is to take place (which notice each Pledgor agrees is commercially reasonable) the whole or any part of the Pledged Collateral and to otherwise act with respect to the Pledged Collateral as though the Lender was the outright owner thereof. Any sale shall be made at a public or private sale at Lender's place of business, or at any place to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as the Lender may deem fair, and the Lender may be the purchaser of the whole or any part of the Pledged Collateral so sold and hold the same thereafter in its own right free from any claim of any Pledgor or any right of redemption. Each sale shall be made to the highest bidder, but the Lender reserves the right to reject any and all bids at such sale which, in its discretion, it shall deem inadequate. Demands of performance, except as otherwise herein specifically provided for, notices of sale, advertisements and the presence of property at sale are hereby waived and any sale hereunder may be conducted by an auctioneer or any officer or the Lender of the Lender. ON THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, EACH PLEDGOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS THE LENDER AS THE PROXY AND ATTORNEY-IN-FACT OF SUCH PLEDGOR WITH RESPECT TO THE PLEDGED COLLATERAL, INCLUDING THE RIGHT TO VOTE THE PLEDGED SHARES, WITH FULL POWER OF SUBSTITUTION TO DO SO. THE APPOINTMENT OF THE LENDER AS PROXY AND ATTORNEY-IN-FACT IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE TERMINATION PURSUANT TO SECTION 11 HEREOF. IN ADDITION TO THE RIGHT TO VOTE THE PLEDGED SHARES, THE APPOINTMENT OF THE LENDER AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO

WHICH A HOLDER OF THE PLEDGED SHARES WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS). SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED SHARES ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF THE PLEDGED SHARES OR ANY OFFICER OR THE LENDER THEREOF), UPON THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT. NOTWITHSTANDING THE FOREGOING, THE LENDER SHALL NOT HAVE ANY DUTY TO EXERCISE ANY SUCH RIGHT OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO.

(ii)    If, at the original time or times appointed for the sale of the whole or any part of the Pledged Collateral, the highest bid, if there be but one sale, shall be inadequate to discharge in full all the Secured Obligations, or if the Pledged Collateral be offered for sale in lots, if at any of such sales, the highest bid for the lot offered for sale would indicate to the Lender, in its discretion, that the proceeds of the sales of the whole of the Pledged Collateral would be unlikely to be sufficient to discharge all the Secured Obligations, the Lender may, on one or more occasions and in its discretion, postpone any of said sales by public announcement at the time of sale or the time of previous postponement of sale, and no other notice of such postponement or postponements of sale need be given, any other notice being hereby waived; provided, however, that any sale or sales made after such postponement shall be after ten (10) days' notice to Pledgor.

(iii)   Each Pledgor recognizes that the Lender may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof in accordance with clause (a) above. Each Pledgor also acknowledges that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private. The Lender shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the Pledged Entity to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if the applicable Pledgor and the Pledged Entity would agree to do so.

(iv)    Each Pledgor agrees to the maximum extent permitted by applicable law that following the occurrence and during the continuance of an Event of Default it will not at any time plead, claim or take the benefit of any appraisal, valuation, stay, extension, moratorium or redemption law now or hereafter in force in order to prevent or delay the enforcement of this Agreement, or the absolute sale of the whole or any part of the Pledged Collateral or the possession thereof by any purchaser at any sale hereunder, and each Pledgor waives the benefit of all such laws to the extent it lawfully may do so. Each Pledgor agrees that it will not interfere with any right, power and remedy of the Lender provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by the Lender of any one or more of such rights, powers or remedies. No failure or delay on the part of the Lender to exercise any such right, power or remedy and no notice or demand which may be given to or made upon a Pledgor by the Lender with respect to any such remedies shall operate as a waiver thereof, or limit or impair the Lender's right to take any action or to exercise any power or remedy hereunder, without notice or demand, or prejudice its rights as against such Pledgor in any respect.

(b)  Other Pledged Collateral.

(i)     Upon the occurrence of an Event of Default and during the continuation of such Event of

Default, the Lender may exercise in respect of the Pledged Collateral, any one or more of the rights and remedies available under the UCC and other applicable law in the State of New York.

(ii)   Upon the occurrence of an Event of Default and during the continuation of such Event of Default, exercise any and all rights and remedies of the type available under the Credit Agreement.

(c)  Application of Proceeds.  Except as otherwise herein expressly provided, the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by the Lender under this Section 5, shall be applied by the Lender:

(i)   First, to the payment of the costs and expenses of such collection, sale or other realization, including reasonable out-of-pocket costs and expenses of the Lender and the reasonable fees and expenses of its agents and counsel, and all reasonable expenses and advances made or incurred by the Lender in connection therewith;

(ii)   Next, to the payment in full of the Secured Obligations; and

(iii)   Finally, to the payment to the Pledgors of any surplus then remaining.

9.     Waiver.  No delay on the Lender's part in exercising any power of sale, Lien, option or other right hereunder, and no notice or demand which may be given to or made upon any Pledgor by the Lender with respect to any power of sale, Lien, option or other right hereunder, shall constitute a waiver thereof, or limit or impair the Lender's right to take any action or to exercise any power of sale, Lien, option, or any other right hereunder, without notice or demand, or prejudice the Lender's rights as against such Pledgor in any respect.

10.    Assignment.  The Lender may assign, indorse or transfer any instrument evidencing all or any part of the Secured Obligations as provided in, and in accordance with, the Credit Agreement, and the holder of such instrument shall be entitled to the benefits of this Agreement.

11.    Termination; Release of Lien on Sold Pledged Collateral.  Immediately following the (a) indefeasible repayment in full in cash of all of the Pledgor's Secured Obligations and (b) the release of the Lender by the Pledgors of all claims against the Lender, the Lender at Pledgors' expense, shall deliver to the Pledgors the Pledged Collateral at the time subject to this Agreement and all instruments of assignment executed in connection therewith, free and clear of the Liens hereof and, except as otherwise provided herein, all of Pledgor's obligations hereunder shall at such time terminate.

12.    Lien Absolute.  All rights of the Lender hereunder, and all obligations of the Pledgors hereunder, shall be absolute and unconditional irrespective of:

(a)  any lack of validity or enforceability of the Credit Agreement, any other Loan Document or any other agreement or instrument governing or evidencing any Secured Obligations;

(b)  any change in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument governing or evidencing any Secured Obligations;

(c)  any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Secured Obligations;

(d) the insolvency of any Pledgor; or

(e) any other circumstance which might otherwise constitute a defense available to, or a discharge of, any Pledgor.

13.    Release. Each Pledgor consents and agrees that the Lender may at any time, or from time to time, in its discretion:

(a) renew, extend or change the time of payment, and/or the manner, place or terms of payment of all or any part of the Secured Obligations; and

(b) exchange, release and/or surrender all or any of the Collateral (including the Pledged Collateral), or any part thereof, by whomsoever deposited, which is now or may hereafter be held by the Lender in connection with all or any of the Secured Obligations; all in such manner and upon such terms as the Lender may deem proper, and without notice to or further assent from any Pledgor, it being hereby agreed that the Pledgors shall be and remain bound under this Agreement, irrespective of the value or condition of any of the Collateral, and notwithstanding any such change, exchange, settlement, compromise; surrender, release, renewal or extension, and notwithstanding also that the Secured Obligations may, at any time, exceed the aggregate principal amount thereof set forth in the Credit Agreement, or any other agreement governing any Secured Obligations. Each Pledgor hereby waives notice of acceptance of this Agreement, and also presentment, demand, protest and notice of dishonor of any and all of the Secured Obligations, and promptness in commencing suit against any party hereto or liable hereon, and in giving any notice to or of making any claim or demand hereunder upon such Pledgor. No act or omission of any kind on the Lender's part shall in any event affect or impair this Agreement.

14.    Reinstatement. This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Pledgor or any Pledged Entity for liquidation or reorganization, should any Pledgor or any Pledged Entity become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of any Pledgor's or a Pledged Entity's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

15.    Miscellaneous.

(a) The Lender may execute any of its duties hereunder by or through the Lender's employees and shall be entitled to advice of counsel concerning all matters pertaining to its duties hereunder.

(b) Each Pledgor agrees to promptly reimburse the Lender for actual out-of-pocket expenses, including, without limitation, reasonable counsel fees, incurred by the Lender in connection with the administration and enforcement of this Agreement.

(c) Neither the Lender, nor any of its respective officers, directors, employees, agents or counsel shall be liable for any action lawfully taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

(d) THIS AGREEMENT SHALL BE BINDING UPON EACH PLEDGOR AND ITS SUCCESSORS AND ASSIGNS (INCLUDING A DEBTOR-IN-POSSESSION ON BEHALF OF ANY PLEDGOR), AND SHALL INURE TO THE BENEFIT OF, AND BE ENFORCEABLE BY, THE LENDER AND ITS SUCCESSORS AND ASSIGNS, AND SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE, AND NONE OF THE TERMS OR PROVISIONS OF THIS AGREEMENT MAY BE WAIVED, ALTERED, MODIFIED OR AMENDED EXCEPT IN WRITING DULY SIGNED FOR AND ON BEHALF OF THE LENDER AND THE PLEDGORS.

16. Severability. If for any reason any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or effect those portions of this Agreement which are valid.

17. Notices. Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give or serve upon any other a communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be delivered in accordance with Section 8.2 of the Credit Agreement.

18. Section Titles. The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

19. Counterparts. This Agreement may be executed in any number of counterparts, which shall, collectively and separately, constitute one agreement. This Agreement may be executed and delivered electronically (including by pdf or fax).

20. Benefit of the Lender. All security interests granted or contemplated hereby shall be for the benefit of the Lender, and all proceeds or payments realized from the Pledged Collateral in accordance herewith shall be applied to the Secured Obligations in accordance with the terms of the Credit Agreement.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

HOSPITAL PARTNERS OF AMERICA, INC.,
as Pledgor

By: _W. Chr Shea_____

Name: _W. Christopher Shea_____

Title: _Sr VP / Chief Legal Officer_

TRINITY MC MANAGEMENT, LLC

By: _W. Chr Shea_____

Name: _W. Christopher Shea_____

Title: _Secretary_____

NEW ENTERPRISE ASSOCIATES 10, LIMITED PARTNERSHIP,
as the Lender

By: _Charles W Newhall III_____

Name: _Charles W. Newhall, III_____

Title: _General Partner_____

## SCHEDULE I

### PLEDGED SHARES

| Name of Subsidiary | Number of Shares, Membership Units or Partnership Interests | Certificate Number* | Percentage Ownership |
|---|---|---|---|
| Surgical Hospital of Austin Management, Inc. | | | |
| Austin Surgical Hospital Holdings, Inc. | | | |
| Trinity MC Management, LLC | | | |

\* IF APPLICABLE

**SCHEDULE II**

## PLEDGE AMENDMENT

This Pledge Amendment, dated _____ __, 20__ is delivered pursuant to Section 6(d) of the Pledge Agreement referred to below.  All defined terms herein shall have the meanings ascribed thereto or incorporated by reference in the Pledge Agreement.  The undersigned hereby certifies that the representations and warranties in Section 5 of the Pledge Agreement are and continue to be true and correct, both as to the shares pledged prior to this Pledge Amendment and as to the shares pledged pursuant to this Pledge Amendment and listed on Schedule I hereto.  The undersigned further agrees that this Pledge Amendment may be attached to that certain Pledge Agreement, dated September 15, 2008, between HOSPITAL PARTNERS OF AMERICA, INC., a Delaware corporation ("HPA"), and TRINITY MC MANAGEMENT, LLC, a Texas limited liability company ("Trinity" and, together with HPA, the "Pledgors," and each a "Pledgor"), and NEW ENTERPRISE ASSOCIATES 10, LIMITED PARTNERSHIP, as the Lender, (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement") and that the Pledged Shares listed on Schedule I hereto shall be and become a part of the Pledged Collateral referred to in said Pledge Agreement and shall secure all Secured Obligations referred to in said Pledge Agreement.

HOSPITAL PARTNERS OF AMERICA, INC.,
as a Pledgor

By:_____
       Name:
       Title:

TRINITY MC MANAGEMENT, LLC

By:_____
       Name:
       Title:

NEW ENTERPRISE ASSOCIATES 10, LIMITED PARTNERSHIP,
as the Lender

By:_____
       Name:
       Title:

Schedule I to Pledge Amendment

| Name and Address of Pledgor | Pledged Entity | Class of Stock or Membership Units | Certificate Number(s)* | Percentage Ownership |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

* If applicable.