IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| HOSPITAL PARTNERS OF AMERICA, INC. et al.,[1] | Case No.: 08-12180 |
| | (Jointly Administered) |
| Debtors. | |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL RELIEF (I) AUTHORIZING POST-PETITION FINANCING; (II) GRANTING LIENS, SECURITY INTERESTS AND SUPER-PRIORITY STATUS; (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PRE-PETITION LENDERS; (IV) SCHEDULING A FINAL HEARING; AND (V) MODIFYING THE AUTOMATIC STAY**

Hospital Partners of America, Inc. ("HPA") and its chapter 11 affiliates, debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),

hereby move (the "Motion"), for entry of an interim order in substantially the same form

attached hereto as Exhibit "A" (the "Interim Order"), seeking, *inter alia:*

(i)     authorization for the Debtors to obtain post-petition financing (the "DIP Credit Facility"), pursuant to sections 105(a), 362, and 364 of Title 11 of the United States Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), on an interim basis for a period (the "Interim Period") from the commencement of the Debtors' cases through and including the date of the Final Hearing (as defined below) in such amounts as are necessary to avoid immediate and irreparable harm,[2] in accordance with the budget reflected in the Projections (defined below) and as such may hereafter be modified from time to time, the "Budget") by entering into that certain Debtor-in-Possession Credit Agreement, a Revolving Credit Note, a Security Agreement and a

---

[1]     The Debtors comprise the following entities: Hospital Partners of America, Inc., a Delaware corporation (Fed. EIN 56-2301189), SJ Medical Center Management, LLC, a Texas limited liability company (Fed. EIN 20-4835598), Surgical Hospital of Austin Management, Inc., a Delaware corporation (Fed. EIN 01-0719812), Austin Surgical Hospital Holdings, Inc., a Delaware corporation (Fed. EIN 01-0719774), and Trinity MC Management, LLC, a Texas limited liability company (Fed. EIN 20-8889391). The address for the Debtors is 2815 Coliseum Centre Drive, Suite 150, Charlotte, North Carolina 28217.

[2]     The aggregate amount to be funded on an interim basis will be determined at the hearing on the Motion, based upon the date on which the interim hearing is held and the date on which the final hearing is scheduled by the Court.

Pledge Agreement, each dated as of September __, 2008 (as the same may be amended, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement", the "Revolving Credit Note", the "DIP Security Agreement" and the "DIP Pledge Agreement", respectively, and copies of which are attached hereto as Exhibits "B-1", "B-2", "B-3", and B-4, respectively), by and among the Debtors, as borrowers, and New Enterprise Associates 10, Limited Partnership, as lender (the "Post-Petition Lender" or "NEA"), and subject to the terms and conditions of the Interim Order, the DIP Credit Agreement, the DIP Security Agreement, the DIP Pledge Agreement, and all related security and other agreements, documents, notes, and instruments executed or delivered pursuant thereto, or in connection therewith (collectively, with the DIP Credit Agreement, the DIP Security Agreement and the DIP Pledge Agreement, and as any of the same shall be amended, restated, supplemented or otherwise modified from time to time, the "DIP Financing Documents")[3];

(ii)    the granting of super-priority administrative expense claim status, pursuant to section 364(c)(1) of the Bankruptcy Code, for all obligations of the Debtors arising under the Interim Order and the DIP Financing Documents (collectively, the "DIP Obligations"), subject to the Carve-Out (defined and described in the Interim Order) and which will not have any recourse to any of proceeds of the Avoidance Actions (as defined and discussed below in Section I.);

(iii)    the granting of liens, mortgages and security interests in favor of the Post-Petition Lender pursuant to sections 364(d)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code (as described in more detail below in Section I.), subject to the Carve-Out and which will not extend to any Avoidance Actions (as defined and discussed below in Section I.);

(iv)    the vacatur and modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Documents and the Interim Order;

(v)    pursuant to Bankruptcy Rules 2002 and 4001, scheduling a final hearing (the "Final Hearing") before the Court to consider entry of a final order in substantially the same form as the Interim Order (subject to modifications described herein, the "Final Order"), authorizing the Debtors on a final basis to obtain advances and loans from the Post-Petition Lender in accordance with the terms and conditions set forth in the DIP Financing Documents, the Final Order, the Budget, and in an aggregate amount not to exceed $2,250,000 (the "Commitment Amount");

(vi)    in the Interim Order, pursuant to sections 361 and 364(d) of the Bankruptcy Code, adequate protection of NEA's interest in the Pre-Petition Collateral (defined below in Section IV.B.), to the extent of any diminution in the value of the Pre-Petition Collateral from and after the Petition Date to and through the Final Hearing resulting from (i) the use by the Debtors of any Pre-Petition Collateral, (ii) the imposition of the DIP Liens (defined below), and (iii) the imposition of the automatic stay, by providing NEA with replacement liens on all Pre-Petition Collateral, subject and junior only to the DIP Liens, the Pre-Existing Liens (as defined in the Credit Agreement) (but only to the extent such Pre-Existing Liens are senior in priority to the

---

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the DIP Credit Agreement.

Pre-Petition Liens (defined below)) and the Carve-Out, and without recourse to any Avoidance Actions;

(vii)    in the Interim Order, authority for the Debtors to draw on the DIP Credit Facility and deposit into one or more segregated deposit accounts, on a weekly basis, the amounts set forth in the Budget in respect of accrued fees and expenses of Alvarez & Marsal North America LLC ("A&M") and of estate professionals, pending entry of Order approving their employment and compensation at the expense of the estates;

(viii)    waiving the ten (10) day stay provisions of Bankruptcy Rule 6004(h); and

(ix)    granting such other and further relief in respect of the Debtors as the Court deems just and proper.

This Motion is supported by the Declaration W. Christopher Shea in Support of First Day Motions (the "Shea Declaration") and the Declaration of Joseph Bondi in Support of Debtors' Motion to Approve DIP Financing (the "Bondi Declaration").  In support of this Motion, the Debtors respectfully represent as follows:

**Summary of Material Provisions**

1.    In accordance with Bankruptcy Rule 4001(c)(1) and Local Bankruptcy Rule 4001-2(a)(ii), the following chart summarizes the material terms and conditions of the proposed DIP Credit Facility, and the location of the provisions in the DIP Credit Agreement and Interim Order that address those materials terms and conditions:

| Provision | Location |
|---|---|
| **Lender.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B))<br><br>New Enterprise Associates 10, Limited Partnership ("NEA"), one of the principal shareholders of HPA, which provided an emergency line of credit in the amount of $1,000,000 in the weeks prior to the Petition Date. | DIP Credit Agreement at 1 (Introductory Statement)<br><br>Interim Order at 1 (Prayer for Relief) |

| Provision | Location |
|---|---|
| **Maximum Interim Loan Amount.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B))<br><br>The Debtors seek interim authority to borrow up to [$_____]⁴ under the DIP Credit Facility through a Final Hearing. | DIP Credit Agreement at 1 (Introductory Statement)<br><br>Interim Order at 2, 8 (Prayer for Relief, ¶2) |
| **Maximum Loan Amount.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B))<br><br>The maximum principal amount available under the DIP Credit Facility is $2,250,000. | DIP Credit Agreement at 1 (Introductory Statement) |
| **Use of Proceeds.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B))<br><br>Use of the proceeds is limited to those expenditures described in the Budget and in such amounts described therein (subject to permitted variances), and that otherwise are consistent with the DIP Financing Documents, the Interim Order and the Final Order.  In particular, the Interim Order provides that although the proceeds of the DIP Credit Facility may be used to investigate the liens and claims of NEA, they may not be used to prosecute any action against NEA. | DIP Credit Agreement at 11 (¶2.02)<br><br>Interim Order at 14, 21 (¶¶11, 24) |
| **Interest Rate.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B))<br><br>Interest will accrue on the loans at the rate of ten percent (10%) per annum, calculated on the basis of a 360-day year, payable in arrears on the last business day of each month. | DIP Credit Agreement at 12 (¶¶ 2.06(a), (c), (d)). |
| **Default Interest Rate.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B))<br><br>While an "Event of Default" (defined in the DIP Credit Agreement) is continuing, interest will accrue at the default rate of twelve percent (12%) per annum, and be payable from time to time on demand of the Post-Petition Lender. | DIP Credit Agreement at 5, 12 (¶ 1.01; ¶¶ 2.06(b), (c), (d)). |
| **Events of Default.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B))<br><br>In addition to the types of provisions which are standard in these types of facilities, the DIP Credit Agreement contains the following deal specific Event of Default:  failure of the Bankruptcy Court to enter a Final Order authorizing the Debtors to repay and replace the full amount outstanding to NEA under the Pre-Petition Credit Agreement with an | DIP Credit Agreement at 26 (¶7.01). |

---

⁴ See *supra* footnote 2.

| Provision | Location |
|---|---|
| advance under the DIP Credit Agreement (the "<u>Roll-Up</u>"). | |
| **Termination Date .** (Disclosure per Bankruptcy Rule 4001(c)(1)(B))<br><br>The "<u>Termination Date</u>" under the DIP Credit Agreement is the earlier of: (i) November 15, 2008 or (ii) the occurrence of an Event of Default. | DIP Credit Agreement at 10 (¶ 1.01). |
| **Superpriority.**   (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(i))<br><br>Pursuant to Bankruptcy Code section 364(c)(1), the DIP Obligations will be entitled to priority over any and all administrative expenses of the kinds specified in or arising or ordered under Bankruptcy Code sections 105(a), 326, 328, 330, 331, 364(c)(1), 503, 506(c), 507, 546, 726, 1113 and 1114 ("<u>Superpriority</u>"), <u>but without recourse</u> to any claims, rights or causes of action under chapter 5 of the Bankruptcy Code or the proceeds thereof (the "<u>Avoidance Actions</u>") and subject to the Carve-Out.<br><br>*This provision remains in effect if interim approval is granted, but final relief is denied. | DIP Credit Agreement at 3, 12 (¶¶ 1.01, 2.07)<br><br>Interim Order at 11 (¶6) |
| **Liens.** (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(i))<br><br>The DIP Obligations will be secured (in all cases <u>subject to the Carve-Out</u> defined and described in the Interim Order): (i) pursuant to Bankruptcy Code section 364(c)(2), by first priority liens and/or security interests on any interest of the Debtors in any and all assets not subject to valid, perfected and non-avoidable liens in existence as of the Petition Date or valid liens in existence on the Petition Date and that have been, as of the date of the DIP Credit Agreement, properly perfected subsequent to the Petition Date, pursuant to section 546(b) of the Bankruptcy Code (the "<u>Unencumbered Collateral</u>"), provided, that Unencumbered Collateral shall not include Avoidance Actions and (ii) pursuant to Bankruptcy Code section 364(c)(3), by junior liens and/or security interests on any interest of the Debtors in any and all assets subject only to valid, perfected and non-avoidable liens in existence on the Petition Date, or to valid liens in existence on the Petition Date that have been, as of the date of the Credit Agreement, properly perfected subsequent to the Petition Date, pursuant to section 546(b) of the Bankruptcy Code (the "<u>Encumbered Collateral</u>"), <u>provided</u>, <u>however</u>, that (w) none of the liens granted to the Post-Petition Lender will extend to property in which the granting of a lien is prohibited or will result in an incurable default of any agreement to which the Debtors or the subsidiaries are a party, (x) notwithstanding the foregoing clause, such liens will extend to the proceeds, products, rents cash and profits of any such property to the extent permitted by law, (y) such liens will extend to such property automatically upon the expiration of such legal prohibition or obligation that would result in an incurable default and (z) such liens shall not extend to any Avoidance Actions. (The Encumbered Collateral | DIP Credit Agreement at 5, 10, 12 (¶¶ 1.01, 2.07).<br><br>Interim Order at 11 - 13 (¶¶ 7,8) |

| Provision | Location |
|---|---|
| and Unencumbered Collateral shall collectively be referred to hereinafter as the "<u>Collateral</u>", and the liens and security interests thereon shall be referred to hereinafter as the "<u>DIP Liens</u>".)<br><br>* This provision remains in effect if interim approval is granted, but final relief is denied. | |
| <u>**Adequate Protection**</u>.   (Disclosure   per   Bankruptcy   Rule 4001(c)(1)(B)(ii))<br><br>NEA (which is also the Post-Petition Lender) in its capacity as a pre-petition lender will receive adequate protection of its interest in the Pre-Petition Collateral, to the extent of any diminution in the value of the Pre-Petition Collateral  from and after the Petition Date <u>to and through the Final Hearing</u>, resulting from (i) the use by the Debtors of any other Pre-Petition Collateral, (ii) the imposition of the DIP Liens, and (iii) the imposition of the automatic stay, and, in connection therewith, be entitled to replacement liens on all Pre-Petition Collateral, subject and junior only to the DIP Liens, the Pre-Existing Liens (as defined in the Credit Agreement), but only to the extent such Pre-Existing Liens are senior in priority to the Pre-Petition Liens (defined below) and the Carve-Out, and without recourse to Avoidance Actions.<br><br>*This provision remains in effect if interim approval is granted, but final relief is denied | Interim Order at 8 (¶2) |
| <u>**Determination of the Validity, Enforceability, Priority or Amount of Prepetition Claim and Lien**</u>.   (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(iii))<br><br>The Debtors have stipulated and otherwise waived their rights to challenge the validity, enforceability, priority or amount of the pre-petition debt owed to NEA (the "<u>Pre-Petition Debt</u>") under the Pre-Petition Credit Agreement (as defined in Section IV.B. below) and the security interests and liens securing such obligations (the "<u>Pre-Petition Liens</u>"); however, the creditors committee appointed in these cases (and any other party with standing, if any) shall have the opportunity <u>through November 20, 2008</u> to investigate, object to, challenge, assert and/or seek to avoid the amount of the Pre-Petition Debt and/or the validity, priority, perfection and extent of the Pre-Petition Liens.<br><br>*This provision remains in effect if interim approval is granted, but final relief is denied | Interim Order at 4, 20 (¶E, 23) |
| <u>**Remedies -- Waiver or Modification of the Automatic Stay**</u>. (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(iv)) | DIP Credit Agreement at 28 (¶7.02) |

| Provision | Location |
|---|---|
| Upon the occurrence of the Termination Date or in the event of the occurrence of an Event of Default, and at all times thereafter, the Post-Petition Lender will be able take any and all actions and exercise any and all rights and remedies allowed under the DIP Financing Documents which the Lender may deem appropriate (<u>without seeking relief from the automatic stay</u>), however, the Post-Petition Lender must give five (5) days' prior written notice of an Event of Default before taking steps to foreclose on the Collateral or otherwise seize control of assets of the Debtors' estates.  Also, the automatic stay is deemed lifted to grant the liens and security interests to the Post-Petition Lender contemplated by the DIP Financing Documents and the Interim Order.<br><br>*This provision remains in effect if interim approval is granted, but final relief is denied. | Interim Order at 19, 20 (¶21, 22) |
| **Waiver or Modification of Rights To (i) File Plan, (ii) Seek Exclusivity Extension, (iii) Request The Use Of Cash Collateral or (iv) Request Authority to Obtain Credit.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(v))<br><br>With regard to (iii), while there is no waiver or modification of the Debtors ability to <u>request</u> use of cash collateral; however, the Debtors cannot use proceeds of the DIP Credit Facility to do so.<br><br>With regard to (iv), it is an Event of Default for any Debtor to seek entry of an order approving any financing or loans senior, pari passu or junior to the DIP Loans without the prior written approval of the Post-Petition Lender, unless the proceeds of such financing or loans will be used to indefeasibly pay in full in cash the DIP Obligations.<br><br>*This provision remains in effect if interim approval is granted, but final relief is denied. | *For (i) and (ii), Not Applicable<br><br>*For (iii) and (iv)<br><br>DIP Credit Agreement at 26 (¶7.01(m))<br><br>Interim Order at 14 - 16 (¶11) |
| **Establishment of Deadlines For Filing A Plan, Approving A Disclosure Statement, Holding a Confirmation Hearing or Entering a Confirmation Order.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(vi)) | Not Applicable |
| **Waiver or Modification of the Applicability of Nonbankruptcy Law to the Perfection of a Lien, or Regarding Foreclosure Or Enforcement of a Lien.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(vii))<br><br>The Interim Order is to be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens. | Interim Order at 16 (¶14) |

| Provision | Location |
|---|---|
| *This provision remains in effect if interim approval is granted, but final relief is denied. | |
| **Indemnification.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(ix))<br><br>The Debtors have agreed to indemnify Post-Petition Lender and each of its affiliates and certain agents and representatives thereof from and against any and all Losses (as defined in the DIP Credit Agreement), except to the extent that such Losses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted primarily from the gross negligence or willful misconduct of any indemnified person.<br><br>*This provision remains in effect if interim approval is granted, but final relief is denied. | DIP Credit Agreement at 35 (¶9.12). |
| **Release, Waiver or Limitation of any Estate Claim or Cause of Action.**  (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(viii) and (x))<br><br>The Debtors have agreed to release any and all claims and causes of action against the NEA in connection with the Pre-Petition Credit Agreement and/or their pre-petition relationship with NEA including any claim or cause of action challenging the validity, enforceability, priority or amount of the Pre-Petition Debt and the Pre-Petition Liens; however, the creditors committee appointed in these cases or any other party with standing shall have until November 20, 2008 to bring such claims or causes of action and not be subject to the terms of the release (if such claims are brought prior to that time).<br><br>As set forth below in more detail, there also is a waiver of surcharge rights under Bankruptcy Code section 506(c).<br><br>There also is a waiver of consequential damages in the DIP Credit Agreement.<br><br>*These provisions remain in effect if interim approval is granted, but final relief is denied. | Interim Order at 4, 20 (¶E, 23)<br><br><br><br><br><br><br>Interim Order at 18 (¶19)<br><br>DIP Credit Agreement at 36 (¶9.12). |
| **No Liens Against Avoidance Actions.**   (Disclosure per Bankruptcy Rule 4001(c)(1)(B)(xi))<br><br>As noted, the DIP Credit Agreement does not confer on the Post-Petition Lender any lien in Avoidance Actions.<br><br>*This provision remains in effect if interim approval is granted, but final | DIP Credit Agreement at 5, 10, 12 (¶¶ 1.01, 2.07).<br><br>Interim Order at 11 - 13 (¶¶ 7,8) |

| Provision | Location |
|---|---|
| relief is denied. | |

2.      In accordance with Local Bankruptcy Rule 4001-2(a)(i) (and in further satisfaction of Bankruptcy Rule 4001(c)(1)), the Debtors highlight the following types of provisions, indicating whether they are included in the DIP Credit Facility, citing the location of such provisions, and providing a brief explanation:

| Provision | Location |
|---|---|
| **Provisions Granting Cross Collateralization.** (Disclosure per Local Bankruptcy Rule 4001-2(a)(i)(A))<br><br>Insofar as the Roll-Up may be considered a cross-collateralization, <u>see</u> Disclosure per Local Bankruptcy Rule 4001-2(a)(i)(E) below. | Interim Order at 8 (¶2) |
| **Determination of the Validity, Enforceability, Priority or Amount of Prepetition Claim and Lien / And Challenge Period Less than 75 Days from Entry of Order.** (Disclosure per Local Bankruptcy Rule 4001-2(a)(i)(B))<br><br>As noted above, the Debtors have stipulated and otherwise waived their rights to challenge the validity, enforceability, priority or amount of the Pre-Petition Debt and the Pre-Petition Liens; however, the creditors committee and any other party with standing, if any, shall have the opportunity **through November 20, 2008** to investigate, object to, challenge, assert and/or seek to avoid the amount of the Pre-Petition Debt and the validity, priority, perfection and extent of the Pre-Petition Liens.<br><br>Giving the creditors committee until November 20, 2008 to investigate and assert a challenge (as opposed to 75 days from the entry of the Interim Order) is appropriate under the circumstances as the pre-petition indebtedness is only $1,000,000, and the documentation relating to the indebtedness is not complicated. | Interim Order at 4, 20 (¶E, 23) |
| **Waiver of Surcharge Rights Under Section 506(c).** (Disclosure per Local Bankruptcy Rule 4001-2(a)(i)(C))<br><br>The Interim Order provides for a waiver of surcharge rights under Bankruptcy Code section 506(c) so long as it is in effect and thereafter | Interim Order at 18 (¶19) |

| Provision | Location |
|---|---|
| only upon entry of the Final Order.<br><br>This provision is appropriate under the circumstances because it only relates to the period prior to the Final Hearing and, during that time, the Post-Petition Lender has agreed to make funds available to them (which are included in the Budget) for the costs and expenses associated with preserving the Post-Petition Lender's collateral, and the Debtors do not anticipate incurring any costs associated with disposing of such property during the Interim Period. | |
| **Granting Of Lien On Avoidance Actions In the Interim Order.** (Disclosure per Local Bankruptcy Rule 4001-2(a)(i)(D)) | Not Applicable |
| **Conversion Of Prepetition Debt To Post-Petition Debt.** (Disclosure per Local Bankruptcy Rule 4001-2(a)(i)(E))<br><br>Subject to entry of the Final Order, the Debtors are required to repay and replace the full amount outstanding to NEA under the Pre-Petition Credit Agreement with an advance under the DIP Credit Agreement (defined above as, the "Roll-Up").<br><br>As of the date hereof, there was approximately $1,000,000 outstanding under the Pre-Petition Credit Agreement. The moneys advanced under the Pre-Petition Credit Agreement were advanced less than a month before these cases were filed in order to preserve the going concern of these Debtors and facilitated the filing of these cases, among other things, with the express understanding that this indebtedness would be rolled into any post-petition financing provided by NEA if the Debtors commenced chapter 11 cases. These funds allowed the Debtors the ability to file an orderly bankruptcy, which will benefit all constituencies. Moreover, the Debtors could not obtain post-petition funding without agreeing to this provision. | Interim Order at 8 (¶2) |
| **Disparate Professional Fee Carve-Out For Professionals Retained by Committee.** (Disclosure per Local Bankruptcy Rule 4001-2(a)(i)(F))<br><br>Insofar as the different amounts budgeted for professionals may be considered disparate treatment, the Budget does contemplate making more funds available to the Debtors' professionals than the creditors' committee's professionals.<br><br>This is justified under the circumstances of these cases as it is expected that the Debtors' professionals will have considerably more to do in these cases. | DIP Credit Agreement at 28 (¶7.02);<br><br>Interim Order at 19 (¶21) |
| **No Priming of Secured Liens Without Consent of Lien Holder.** (Disclosure per Local Bankruptcy Rule 4001-2(a)(i)(G)) | Interim Order at 11 (¶¶ 7) |

| Provision | Location |
|---|---|
| The DIP Liens will be senior (in terms of priority) over any pre-petition lien which is voided, extinguished or determined not to be valid as the Interim Order provides that the DIP Liens shall, notwithstanding anything to the contrary in section 551 of the Bankruptcy Code, be deemed perfected first priority liens without any further action by the Lender or the Court.<br><br>Insofar as the foregoing falls within this disclosure requirement, its inclusion is justified simply because no such lien holder is prejudiced by the provision so there should be no need to obtain its consent. |  |

### Status of Case and Jurisdiction

3.      On September 24, 2008 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for chapter 11 relief under Bankruptcy Code.

4.      The Debtors have continued in the possession of their property and are operating and managing their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request for a trustee or examiner has been made and no creditors' committee has been appointed in these cases.

6.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O).

7.      Venue of these proceedings and this Application is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are section 105(a) and 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## Background

9.      The detailed factual background relating to the Debtors and the commencement of these chapter 11 cases is set forth in the *Declaration of W. Christopher Shea in Support of First Day Motions* (the "Shea Declaration").

10.      The Debtors directly and indirectly hold majority equity positions in, and provide certain management services to, four hospitals located in California and Texas (the "Operating Hospitals").  The minority equity interests in the Operating Hospitals are held directly or indirectly by physician investors.  HPA and the other Debtors are guarantors of virtually all of the major funded debt of the Operating Hospitals.

11.      None of the Operating Hospitals is a debtor in these cases.  However, HPA is the corporate parent of River Oaks Holdings, Inc. ("River Oaks Holdings"), holder of a substantial equity position in River Oaks Medical Center, L.P. ("River Oaks Partnership").  Both River Oaks Holdings and River Oaks Partnership are debtors in possession in cases pending before this Court.

12.      HPA currently employs 18 individuals, all but one of whom work at the Debtors' headquarters in Charlotte, North Carolina.  (The other Debtors have no employees.)  Pursuant to a series of management agreements, HPA's employees provide management and support services to the personnel of the non-Debtor Operating Hospitals, including services relating to human resources, financial, legal, regulatory and information technology matters.  HPA personnel also provide management services to a fifth hospital in which HPA has no direct or indirect ownership interest.

13.     The non-Debtor Operating Hospitals employ approximately 3,800 individuals who provide medical services and related support services to patients at those hospitals.  HPA employees do not provide any patient services or conduct the day-to-day operations of any medical facility.

14.     As a result of substantial losses at the River Oaks Medical Center and several of the Operating Hospitals, and as a result of the Debtors' direct and indirect funding of those losses over time, the Debtors have been experiencing their own liquidity issues.

15.     Prior to the Petition Date, the Debtors began an effort to address their financial difficulties and those of the Operating Hospitals by initiating a marketing process, with the objective of either selling their interests in the Operating Hospitals or arranging the sale of the Operating Hospitals themselves.  Unfortunately, the Debtors were not able to facilitate any of these potential transactions before the cash available to fund their own operations reached a critically low level.

16.     The Debtors have filed voluntary petitions for relief under chapter 11 for the purpose of preserving and maximizing the value of the property of the estates (including the Debtors' interests in the Operating Hospitals), allowing the marketing and sale efforts that are underway to continue, facilitating a smooth transition to new ownership and management, and minimizing the claims against the Debtors' estates (most of which comprise guarantees of liabilities as to which an Operating Hospital is the primary obligor).

17.     HPA's largest equity holder, NEA, has agreed to provide the Debtors with certain debtor in possession financing in order to achieve these objectives in chapter 11.

13

### Prepetition Indebtedness

18.      As described in more detail in the Shea Declaration, the material indebtedness of these Debtors relates to certain guarantee obligations with respect to funded indebtedness and leases of certain of the Operating Hospital.  In the aggregate, the Debtors are guarantors of approximately $330 million of indebtedness of the Operating Hospital.  In most cases the guarantee obligations are unsecured; however, guarantee obligations of the Debtors in the approximate amount of $210 million are secured by stock pledges (as discussed in detail below).  In addition, as discussed below, the Debtors obtained an emergency line of credit from NEA (one of the principal shareholders of HPA) in the amount of $1,000,000 just weeks before the filing of these cases, which obligations are secured by stock pledges and a security interest in certain net cash proceeds from the disposition of other equity interests.

### A.      Secured Guarantee Indebtedness.

19.      HPA guaranteed (the "HPA Shasta Guarantee") certain obligations of Shasta Regional Medical Center, LLC ("Shasta Operating"), the owner and operator of Shasta Regional Medical Center in Redding, California ("SMRC Hospital"), as lessee under that certain lease agreement with MPT of Shasta, L.P., as lessor of the SMRC Hospital premises (the "Shasta MPT Lease").  As of July 31, 2008, the balance owing under the Shasta MPT Lease was approximately $60 million, on an accelerated basis.  To secure its obligations under the HPA Shasta Guarantee, HPA pledged its equity interest in its wholly-owned subsidiary, SRMC Management, Inc. ("Shasta Management"), which owns a membership interest (comprised of 81.9% of the equity) in Shasta Operating (which, as noted above, owns SMRC Hospital).  The

Shasta MPT Lease is in default, and Shasta Operating has ceased making lease payments thereunder.  Neither Shasta Management nor Shasta Operating are Debtors in these cases.

20.    HPA guaranteed (the "HPA River Oaks Guarantee") certain obligations of River Oaks Hospital Partnership, the prior operator of River Oaks Hospital in Houston, Texas ("River Oaks Hospital"), as lessee under that certain lease agreement with MPT of Twelve Oaks, L.P. ("MPT-River Oaks") as lessor of the River Oaks Hospital premises (the "River Oaks MPT Lease").  As of July 31, 2008, the balance owing under the River Oaks MPT Lease was approximately $40 million, on an accelerated basis.  To secure its obligations under the HPA River Oaks Guarantee, HPA pledged its equity interest in its wholly owned subsidiaries, River Oaks Holdings, Inc. and River Oaks Medical Management Inc., the general partner (with a .9% interest) and a limited partner (with 59.45% interest), respectively, in the River Oaks Hospital Partnership (which, as noted above, owns River Oaks Hospital).  Prior to the commencement of chapter 11 cases for River Oaks Holdings and River Oaks Management on June 23, 2008, and July 2, 2008, respectively, the River Oaks MPT Lease was in default, and was terminated by MPT-River Oaks.[5]

21.    Each of Shasta Management, River Oaks Holdings and River Oaks Management also guaranteed the obligations of both Shasta Operating and River Oaks Hospital Partnership under the Shasta MPT Lease and the River Oaks MPT Lease (the "Subsidiary Shasta/River Oaks Guarantees").  To secure their obligations under the Subsidiary Shasta/River Oaks Guarantees:

---

[5]    By letter dated May 23, 2008, MPT-River Oaks advised the River Oaks Hospital Partnership of its position that the River Oaks Hospital Partnership was in default of the River Oaks MPT Lease.  By letter dated June 23, 2008, MPT-River Oaks advised the River Oaks Hospital Partnership of its election to terminate the River Oaks MPT Lease.

(i) Shasta Management pledged its membership interest in Shasta Operating, (ii) River Oaks Management pledged its general partnership interest in the River Oaks Hospital Partnership, and (iii) River Oaks Holdings pledged its limited partnership interest in the River Oaks Hospital Partnership.

22.     In addition, pursuant to a transaction effectuated just before the commencement of these cases, HPA and non-Debtor Shasta Management pledged certain of their assets to MPT Development Services, Inc. ("MPT Development"), an affiliate of MPT of Shasta, L.P, in connection with a $3 million emergency loan facility provided by MPT Development in order to maintain operations at the Shasta Medical Center ("Emergency MPT Facility"). Specifically, HPA and Shasta Management pledged their interests in all intercompany claims owed to them by Shasta Operating (approximately $17.3 million) to secure (i) the $3 million in emergency advances, (ii) the existing obligations of HPA, Shasta Management and Shasta Operating in respect of the Shasta MPT Lease, and (iii) all existing obligations of HPA, River Oaks Management, River Oaks Holding and River Oaks Operating in respect of the River Oaks MPT Lease. Shasta Operating also granted first priority liens in its assets (subject to existing liens) to secure the Emergency MPT Facility. [6]

23.     HPA and SJ Medical Center Management, LLC ("St. Joseph Management") guaranteed certain obligations of SJ Medical Center, LLC, d/b/a St. Joseph Medical Center ("St.

---

[6]   Among other things, MPT Development also required as a condition to the Emergency MPT Facility (i) that HPA amend the bylaws of Shasta Management to appoint an "independent director" approved by MPT Development in its sole discretion and to require that the filing of a bankruptcy case for Shasta Operating or any other "extraordinary" action require the consent of the newly appointed independent director, and (ii) that HPA, Shasta Management and Shasta Operating grant a broad general release to MPT Development, MPT-Shasta, MPT-River Oaks and all their respectively officers, directors, employees, affiliates and agents. HPA, Shasta Management and Shasta Operating acceded to these requests given the dire liquidity situation at the Shasta Regional Medical Center and the need to maintain quality patient care pending a sale of the hospital.

Joseph Operating"), the owner and operator of St. Joseph Medical Center in Houston Texas ("St. Joseph Medical Center"), under (i) that certain first lien term loan to St. Joseph Operating by GE Business Financial Services, Inc. ("GEBFS"), as of July 31, 2008, the balance of which is approximately $74 million ("SJ First Lien Term Loan Guarantee"), (ii) that certain second lien term loan to St. Joseph Operating by Silver Point Capital ("Silver Point"), as of July 31, 2008, the balance of which is approximately $35 million ("SJ Second Lien Term Loan Guarantee"), and (iii) that certain revolving loan facility to St. Joseph Operating by GEBFS, as of July 31, 2008, the balance of which is approximately $19 million ("SJ Revolving Loan Guarantee," and together with the foregoing, the "SJ Guarantees"). The obligations of St. Joseph Management (which is a Debtor in these cases) under the SJ First Lien Term Loan Guarantee and the SJ Second Lien Term Loan Guarantee are secured by pledges of its membership interest (comprised of 78.4% of the equity) in St. Joseph Operating (which, as noted above, owns St. Joseph Medical Center). The obligations of St. Joseph Management under the SJ Revolving Loan Guarantee, and of HPA under the SJ Guarantees are unsecured.[7]

24.    As discussed above in Section I., the relief sought herein will not affect or otherwise impair any valid, perfected and non-avoidable liens and security interests of MPT of Shasta L.P., MPT-River Oaks, GEBFS and Silver Point.

**B.    Emergency Secured Line of Credit**

25.    On September 15, 2008, HPA and NEA (which, as noted above, is one of the principal shareholders of HPA and the Post-Petition Lender) entered into that certain "Credit

---

[7]    As of the Petition Date, St. Joseph Operating was in default of its obligation to pay interest to Silver Point on its second-lien term loan.

Agreement" (as amended on September 22, 2008, the "Pre-Petition Credit Agreement") under

which NEA provided a $900,000 emergency line of credit on September 15, 2008, which line

was increased by an additional $100,000 on September 22, 2008 (the "Emergency Line of

Credit") in order to fund certain costs and expenses of maintaining HPA's operations (including

employee compensation, employee benefits, utility bills, and other operational costs) and enable

HPA and certain of its to file chapter 11 cases (by enabling them to pay professional fees,

expenses and retainers, among other things).  Pursuant to that certain "Pledge and Security

Agreement" dated September 15, 2008, HPA and its wholly-owned subsidiary, Trinity MC

Management LLC ("Trinity Management"), agreed to secure HPA's obligations under the

Emergency Line of Credit with the following (collectively, the "Pre-Petition Collateral"): (i) a

pledge by HPA of its equity interest in its wholly-owned subsidiaries Surgical Hospital of Austin

Management, Inc. ("Austin Management") and Austin Surgical Hospital Holdings, Inc. ("Austin

Holdings") the general partner (with a 1.03% interest) and a limited partner (with 90.75 %

interest), respectively, in Surgical Hospital of Austin L.P., the owner and operator of Surgical

Hospital of Austin in Austin, Texas (the "Austin Hospital"), (ii) a pledge by HPA of its equity

interest in its wholly-owned subsidiary, Trinity Management, which holds a membership interest

(comprised of 71% of the equity) in Trinity MC, LLC, the owner and operator of Trinity Medical

Center in Carrollton, Texas (the "Trinity Medical Center"), and (iii) the "Net Cash Proceeds" (as

defined therein) from any sale or other disposition of any equity interests held by HPA and

Trinity Management (other than those identified in (i) and (ii) above).

18

26.     At the time NEA agreed to provide the Emergency Line of Credit, it indicated to

HPA and the other Debtors that it was doing so only with the express understanding that HPA

and its debtor-affiliates, should they file chapter 11 cases, would seek to "roll" the outstanding

balance of the Emergency Line of Credit into any post-petition financing facility furnished by

NEA, and, to that end, the Debtors have requested that the Pre-Petition Debt be rolled up into the

DIP Credit Facility upon entry of a Final Order.

## The Debtors' Urgent Need For Post-Petition Financing

27.     The continued operations of the Debtors, and the provision of support services to

the Operating Hospitals, require that the Debtors have liquidity, among other things, to pay

compensation to the Debtors' employees, pay the other costs and expenses of maintaining their

corporate headquarters in Charlotte, North Carolina, maintain casualty insurance that has been

procured on a group-basis by HPA for the benefit of the Debtors and the Operating Hospital, and

maintain the HPA employee benefit plans.  As of the Petition Date, however, the Debtors had

only a minimal amount of cash.

28.     Simply put, the Debtors require a line of credit to operate.  Without the necessary

liquidity to meet the above-described costs, the Debtors will not be able to continue providing

management services to the Operating Hospital Entities.  An interruption in the ability of HPA to

provide these services – even if temporary – would likely cause immediate and irreparable harm

to the Operating Hospitals and the value of HPA's investments in the Operating Hospital

Entities.[8]

---

[8]     As the process of marketing the hospitals progresses, it ultimately may be the case that HPA is unable to realize
any equity value from certain of the hospitals. From HPA's perspective, however, it nevertheless is appropriate

29.    With these circumstances in mind, the Debtors negotiated with NEA (one of the principal shareholders of HPA) to obtain the DIP Credit Facility so that the Debtors may continue operating while they pursue a restructuring and/or sale of assets in chapter 11. The Debtors' need for approval of the DIP Credit Facility is critical and immediate to prevent irreparable harm to the Debtors and their estates directly, and indirectly, by preventing irreparable harm to the Operating Hospitals. The terms of the DIP Credit Facility have been reviewed and approved unanimously by the board of directors for each of the Debtors, each of which includes a member that is not affiliated with NEA.

30.    In anticipation of these chapter 11 cases, the Debtors developed cash flow projections (together with the "Notes" thereto, "Projections") reflecting anticipated revenue and expenditures through the week ended December 19, 2008 ("Projection Period"), a copy of which is attached as Exhibit "C" to this Motion. The Projections attempt to account for the effect that this bankruptcy filing on the Debtors' financial performance. However, if the Debtors are unable to obtain immediate financing, the anticipated results could decline materially.

31.    As of the Petition Date, the Debtors anticipate having only minimal cash to fund their operations. The Projections show that the Debtors expect to continue receiving management fees from most of the Operating Hospitals, as well as reimbursement for certain expenses incurred by HPA on behalf of the Operating Hospital Entities. The Projections show,

---

to seek to maximize the value that may be derived from all of the hospitals for several reasons. First, most of HPA's liabilities are guarantee liabilities. To the extent value of particular hospital is maximized (even if there is no equity in it), the value realized by creditors of that hospital that also have guarantees against HPA will reduce the claims against HPA and increase the chances for a greater recovery by the remaining creditors of HPA. Second, the sudden, chaotic liquidation of any of the hospitals in the HPA corporate family likely would impact the ability of the remaining HPA-affiliated to attract and retain qualified personnel, to maintain positive vendor relations, and impair the ability of HPA to maximize its interests in those hospitals.

however, that the Debtors require additional funding to avoid liquidity shortfalls and maintain smooth operations.

32.    NEA has committed to fund up to $2.25 million (the "Commitment Amount") under the DIP Credit Facility, which is substantially equivalent to the HPA's projected borrowing needs through the week ended October 31, 2008. The maturity of the DIP Facility is November 15, 2008. (If HPA exceeds its projected performance, it will be permitted to continue borrowing up to the Commitment Amount between October 31, 2008 and November 15, 2008). It is the Debtors' understanding that NEA may consider, in its sole discretion, increasing the Commitment Amount and/or extending the maturity of the DIP Credit Facility, based upon the level of progress achieved in (a) completing the ongoing restructuring and transfer of employee benefit programs to the Operating Hospitals, (b) preparing the Operating Hospitals to function independently and without administrative support from HPA, and (c) obtaining more definitive written commitments from potential buyers of the Operating Hospitals or the Debtors' equity in the hospitals.

33.    The Projections reveal that the Debtors require emergency interim approval of the DIP Credit Facility in order to maintain their operations. The Projections show that through the week ended October 17, 2008, the Debtors need to make cash disbursements of approximately $2,200,000, of which approximately $1,500,000 must be borrowed under the DIP Credit Facility. These distributions include (in approximate amounts): (i) salaries, wages, and benefits of $475,000, (ii) other operating expenses of approximately $252,500, (iii) up to $200,000 in contingent expenditures (remittance in respect of any shortfalls in the "Employee Benefit Trust"

discussed in the Shea Declaration), (iv) casualty insurance for the Debtors and the Operating

Hospitals of $345,000 (a portion of which is to be reimbursed by the Operating Hospitals), (v)

employee benefit claims in respect of former River Oaks Hospital employees in the amount of

$43,000, and (vi) remittances to one or more segregated reserve accounts in the approximate

amount of $842,000 in respect of services performed by A&M and by estate professionals during

that period (disbursement of which will be subject to further Order of the Court).[9]

34.     In sum, without immediate access to post-petition financing, the Debtors would

be unable to continue operations and would suffer immediate and irreparable harm to their

estates and creditors.  In addition, because the Debtors will not have sufficient funds to meet

expenses necessary to conduct the above-referenced tasks before a final hearing can be held, it is

essential that they obtain interim financing.

## Negotiation Of The DIP Credit Agreement

35.     Prior to the Debtors and NEA reaching agreement on the DIP Credit Facility,

A&M, which was engaged back in May 2008 to provide financial advisory services to HPA,

undertook efforts to determine whether there were alternative lending sources for the Debtors

and the basis upon which they might be available.  A&M spoke with several potential lenders

about providing a debtor in possession facility, but none of them expressed interest in providing

such financing on an unsecured, or even on a secured, super-priority basis.  The potential lenders

with which A&M spoke cited the "soft" nature of the Debtors' assets (i.e., equity interests in the

---

[9]    Even without making professional fee trust remittances during this period, the Projections show that the Debtors
will require borrowings under the DIP Credit Facility of almost $1,000,000 through October 17, 2008, in order
to satisfy payroll and other operational expenses.

Operating Hospital Entities), the fact that those interests were already encumbered, and/or the limited nature of HPA's revenue stream (i.e., from management fees and intercompany reimbursements) as reasons why they were unwilling to provide a debtor in possession facility. Thus, the Debtors are unable to satisfy their financing needs with unsecured, administrative priority loans as such funding is simply not available. In sum, the Debtors are unable to obtain the credit they need on any basis other than by granting the liens and super-priority claims proposed under the DIP Credit Facility.

36.     The DIP Credit Facility embodies the best terms available to the Debtors under the circumstances, and is fair and reasonable. The agreement was heavily negotiated between the Debtors and NEA, in good-faith and at arms' length. Significant concessions were made by each of the parties. The Debtors were represented in these negotiations by Joseph Bondi of A&M and HPA's Chief Legal Officer, W. Christopher Shea, with assistance of bankruptcy counsel at Klee, Tuchin, Bogdanoff & Stern LLP (Lee R. Bogdanoff, Martin R. Barash, and Jennifer L. Dinkelman). NEA was represented by Jeffrey Levitan and other counsel at Proskauer Rose LLP. At no time have the Debtors' representatives or professionals sought anything other than to maximize the interests of the Debtors in negotiating the terms of the DIP Credit Facility.

37.     Although there is no guarantee that the funding commitment of NEA will be sufficient to achieve all of the Debtors objectives, or do so prior to the existing maturity date of the DIP Credit Facility, entering into the DIP Credit Facility is a far better than the alternative – an abrupt termination of operations and liquidation. As noted, the Debtors have insufficient cash to fund their own operations and there is no other lender willing to advance what the Debtors

23

require to continue their operations. NEA has already advanced the Debtors $1 million, and is prepared to advance another $2.25 million under the DIP Facility.

38.    By entering into the DIP Credit Facility, the Debtors will be permitted to continue their efforts to facilitate the sale of their interests in the Operating Hospitals, assist the hospitals in establishing their operational independence, and assist the hospitals in establishing their own independent benefit programs. Alternatively, if the Debtors do not enter into the DIP Facility and are not able to continue providing management services and support to the Operating Hospitals, the operations of the hospitals would be significantly disrupted and some of the hospitals may be forced to abruptly terminate their operations. An abrupt and disorderly termination of operations HPA's services at any of the Operating Hospitals could jeopardize patient safety and would obviously impose a hardship on employees.

39.    Thus, notwithstanding the current limitations on the funding commitment, the Debtors have determined, in the exercise of their sound business judgment, that the DIP Credit Facility would be beneficial to the estates, and in the best interests of patients, employees and other stakeholders. While the Debtors are well aware of the fact that the "roll-up" to NEA is extraordinary relief, the facts and circumstances surrounding these cases justify such relief. Despite prepetition efforts, the Debtors were simply unable to secure prepetition financing from any party other than NEA that would have enabled them to transfer patients to other health care facilities and conduct the other numerous tasks necessary to safely wind down the certain operations prepetition. The Debtors agreed, in exchange for receipt of this desperately needed prepetition financing, to seek to have the prepetition loan from NEA "rolled-up" in NEA's post-

24

petition loan. Further, the Debtors have an immediate need for the post-petition financing

provided by NEA and, as evidenced by the Budget, which is critical to paying the necessary

administrative and other costs necessary for these cases, and preserving the value of the

Operating Hospitals as they pursue a restructuring and/or sale of assets in chapter 11.

Accordingly, the terms of the DIP Credit Agreement and the other DIP Financing Documents

should be approved.

**Applicable Legal Authority**

A.      **Legal Requirements For Approval of the Financing.**

40.      Bankruptcy Code section 364 provides that a debtor in possession that is

authorized to operate its business may obtain financing either in the ordinary course of business

or outside the ordinary course of business. First, Bankruptcy Code section 364(a) allows the

debtor to obtain unsecured credit and to incur unsecured debt in the ordinary course of business.

11 U.S.C. § 364(a). Second, after notice and a hearing, the Court may authorize a debtor in

possession to obtain financing outside the ordinary course of business. Bankruptcy Code section

364(b) states that this financing may be allowable as an administrative expense under

Bankruptcy Code section 503(b)(1). 11 U.S.C. § 364(b). If the debtor in possession is unable to

obtain unsecured credit on this basis, Bankruptcy Code section 503(c) allows the Court – again

after notice and a hearing – to authorize the debtor in possession to obtain credit or to incur debt

that has priority over administrative expenses under Bankruptcy Code section 503(b)(1), 11

U.S.C. § 364(c)(1); that is secured by a lien on unencumbered estate property 11 U.S.C.

§ 364(c)(2); or that is secured by a junior lien on encumbered estate property. 11 U.S.C.

§ 364(c)(3).

41.     Other than the requirement of notice and a hearing, the only statutory prerequisite

for obtaining credit on a secured basis is that the debtor in possession must be unable to obtain

credit allowable as an administrative expense:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> * * *
>
> secured by a lien on property of the estate that is not otherwise subject to a lien ....

11 U.S.C. § 364(c)(2).

42.     This threshold test is certainly satisfied here.  Despite their efforts, the Debtors

have been unable to obtain unsecured credit to finance their operations.  Moreover, the Debtors

simply cannot obtain alternative financing of the magnitude proposed under the Interim Order on

an unsecured basis, even if the resulting claim is allowed as an administrative claim.  The

alternatives to the Interim Order are not beneficial to the estates or creditors.  The Debtors are

consuming more cash than they generate, making it impossible for them to continue to operate

their business pending an orderly disposition of their hospitals.  A fire sale liquidation of the

Operating Hospital Entities or their assets would result in severely reduced values.

**B.      The Financing Is Supported By Sound Business Judgment.**

43.     Generally, courts give broad deference to the business decisions of a debtor in

possession.  See, e.g., Richmond Leasing v. Capital Bank, 762 F.2d 1303, 1311 (5th Cir. 1985).

In particular, a bankruptcy court generally will respect a debtor in possession's business

judgment regarding the need for a proposed use of funds.  As the court noted in In re Ames

Department Stores, Inc., 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the bankruptcy court should defer

to a debtor in possession's reasonable business judgment so long as the proposed financing

agreement does not contain terms that either leverage the bankruptcy process or that benefit a

third party rather than the bankruptcy estate:

> [A] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.

Id. at 40.

44.     A debtor in possession's power to incur secured debt necessarily follows from the

debtor in possession's general power to operate its business in the exercise of its business

judgment. See 11 U.S.C. § 1108. Without the ability to incur secured debt, a debtor in

possession would be placed at a significant competitive disadvantage and its efforts to reorganize

or sell assets (as the case may be) could be seriously impaired.

45.     Here, the Debtors' decision to enter the DIP Financing Documents is an exercise

of sound business judgment in the continued operation of the Debtors' businesses. Without

financing to cover the Debtors' cash needs, the Debtors would be unable timely to satisfy their

administrative obligations and these chapter 11 cases would be doomed from the start. The DIP

Credit Agreement and the Interim Order addresses these problems by providing the Debtors with

funds necessary to meet ongoing operational costs; allowing them to preserve the value pending

an orderly disposition of their hospitals.

46.     While the DIP Credit Facility requires a "roll-up" of the obligations under the

Pre-Petition Credit Agreement upon entry of the Final Order, the Debtors could only obtain post-

petition funding by agreeing to this provision. Moreover, this requirement does not adversely

impair the valid, perfected liens and security interests of any secured creditor of the Debtors.

Indeed, provisions such as these are often included in complex financing and cash collateral arrangements. See, e.g., In re Stein 7 Day, Inc., 87 B.R. 290-92 (Bankr. S.D.N.Y. 1988) (providing for roll-up of pre-petition debt); Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358 (W.D. Mich. 1986), aff'd, 834 F.2d 599 (6th Cir. 1987) (validation of liens, repayment of pre-petition debt).

47.     In short, there are simply no other viable alternatives, and the Debtors have negotiated in good faith and at arms-length, the best financing arrangement that it can realistically expect to obtain under the circumstances. Accordingly, under these circumstances, the Court should enter the Interim Order. See, e.g., In re Van Guard Diversified, Inc., 31 B.R. 364, 367 (Bankr. E.D.N.Y. 1983) (bankruptcy court approved both an administrative super-priority and cross-collateralization in favor of a prepetition lender as part of debtor-in-possession financing where, among other things, the failure to provide such financing would have caused the chapter 11 case to fail and the value of the unencumbered assets at liquidation would have been less than the lender's claims).

## C.     The Proposed Interim Borrowing Is Appropriate Under the Circumstances.

48.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain post-petition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., Simasko, 47 B.R. at 449; see also Ames, 115 B.R. at 38.

After the 15-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., Simasko, 47 B.R. at 449; Ames, 115 B.R. at 36.

**D.    Good Faith.**

49.    The terms and conditions of the DIP Financing Documents and the Interim Order are fair and reasonable and were negotiated by the parties in good faith and at arms' length. And while NEA is one of the principal shareholders of HPA, the terms of the DIP Credit Facility have been reviewed and approved unanimously by the board of directors for each of the Debtors (including HPA), each of which includes a member that is not affiliated with NEA. Therefore, the Post-Petition Lender should be accorded the benefits of Bankruptcy Code section 364(e) to the extent any or all of the provisions of the DIP Financing Documents, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

**E.    Request for Modification of the Automatic Stay.**

50.    The DIP Financing Documents, the Interim Order and Final Order contemplate modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the Post-Petition Lender, to the extent necessary to perform any act authorized or permitted under or by virtue of the Interim and Final Orders or the DIP Credit Agreements, including, without limitation, (a) to implement the post-petition financing arrangements authorized by the Interim and Final Order, (b) to take any act to create, validate, evidence, attach

or perfect any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the obligations, including, without limitation, all interest, fees, costs and expenses permitted under the DIP Credit Agreement, and apply such payments to the obligations pursuant to the DIP Credit Agreement and the Interim and Final Orders.

51.    In addition, and without limiting the foregoing, upon the occurrence of an Event of Default, the Post-Petition Lender shall be entitled to take any action and exercise all rights and remedies provided to it by the Interim and Final Orders, the DIP Credit Agreement or applicable law to, among other things, foreclose upon all or a portion of the Collateral (though there is a requirement that the Post-Petition Lender provide five (5) days' notice to the Debtors and certain other parties before doing so).

52.    Stay modification provisions of this type are customary features of post-petition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Credit Agreement.

### Notice

53.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee and (ii) parties known to the Debtors as having or purporting to have secured claims against any of the Debtors, and (iii) the proposed Post-Petition Lender (NEA). Notice of the "first day" hearing on this Motion has been served on such parties and on the creditors holding the twenty largest unsecured claims against the Debtors as identified in the Debtors' petitions or their legal counsel, if known. Following the

first day hearing in these cases, the Debtors will serve copies of this Motion and any order approving to this Motion in accordance with **Local Rule** 9013-1(m)(iii) and (iv).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

<u>**No Prior Request**</u>

54.    No prior request for the relief sought in this Motion has been made to this or any other court.

*Remainder of page left intentionally blank*

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order and grant the relief requested herein and such other and further relief as this Court deems appropriate.

DATED: September 2 4, 2008

> KLEE, TUCHIN, BOGDANOFF & STERN LLP
> Lee R. Bogdanoff (CA Bar No. 119542)
> Michael L. Tuchin (CA Bar No. 150375)
> Martin R. Barash (CA Bar No. 162314)
> 1999 Avenue of the Stars, 39th Floor
> Los Angeles, California 90067-6049
> Telephone (310) 407-4000
> Facsimile (310) 407-9090
> Email: lbogdanoff@ktbslaw.com
>            mtuchin@ktbslaw.com
>            mbarash@ktbslaw.com
>
>            -and-
>
> PACHULSKI STANG ZIEHL & JONES LLP
>
> Laura Davis Jones (Bar No. 2436)
> Michael R. Seidl (Bar No. 3889)
> Curtis A. Hehn (Bar No. 4264)
> 919 North Market Street, 17th Floor
> P.O. Box 8705
> Wilmington, DE 19899-8705 (Courier 19801)
> Telephone:  (302) 652-4100
> Facsimile:  (302) 652-4400
> E-mail:  ljones@pszjlaw.com
>            mseidl@pszjlaw.com
>            chehn@pszjlaw.com
>
> [Proposed] Counsel for the Debtors
> and Debtors In Possession